UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

```
──────────────────────────────x
                              :
LUKE WILSON,                  :
                              :
                  Plaintiff, :        5:21-cv-00055-TTC
                              :
     - against -              :
                              :
THE TOWN OF MOUNT JACKSON,    :
CHIEF OF POLICE JEFF STERNER, :
SERGEANT KEITH COWART, and    :
POLICE OFFICERS CHRISTINA     :
WHORTON, ROBERT YOUNG and MARK:
JOHNSON of the MOUNT JACKSON  :
POLICE DEPARTMENT, and TODD   :
HOLTZMAN,                     :
                              :
                  Defendants. :
──────────────────────────────x
```

## PLAINTIFF'S RESPONSE TO DEFENDANT
## CHRISTINA WHORTON'S MOTION TO DISMISS

### I. INTRODUCTION

But the thing that David had done displeased the Lord, and the Lord sent Nathan to David. He came to him, and said to him, "There were two men in a certain city, the one rich and the other poor. The rich man had very many flocks and herds; but the poor man had nothing but one little ewe lamb, which he had bought. He brought it up, and it grew up with him and with his children; it used to eat of his meager fare, and drink from his cup, and lie in his bosom, and it was like a daughter to him. Now there came a traveler to the rich man, and he was loath to take one of his own flock or herd to prepare for the wayfarer who had come to him, but he took the poor man's lamb, and prepared that for the guest who had come to him." Then David's anger was greatly kindled against the man. He said to Nathan, "As the Lord lives, the man who has done this deserves to die; he shall restore the lamb

fourfold, because he did this thing, and because he had no pity.

Nathan said to David, "You are the man! . . ."

– 2 *Samuel* 11:27b-12:7a (NRSV)

Most people who have attended church or synagogue know the context of the story quoted above. King David, of course, has just committed adultery with Bathsheba, who was the wife of Uriah. Then, partly to cover up his crime, and partly so that he can have Bathsheba as his own wife, he conspires with his lieutenants to make sure that Uriah is killed. First adultery, and then conspiracy and murder. Serious though the crime of theft may be, there can be no question but that King David's crimes were orders of magnitude worse than the crime committed by the rich man. Why, then, was David's anger "kindled" against the fictional rich man – so much so that David declared that the rich man "deserve[d] to die"?

The thing that enraged King David was not so much the crime of theft. Theft was not the rich man's only crime – just as adultery, conspiracy, and murder were not King David's only crimes. On top of these underlying crimes, both King David and the fictional rich man were guilty of egregious abuses of power. They had deprived their less fortunate and less powerful neighbors of their rights, for no other purpose than to enrich themselves.

Tellingly, Defendant Todd Holtzman – the King David of the drama that is before this Court – has not bothered to file a motion to dismiss. But King David did not act alone. He needed the help of Joab, the commander of the army – and Joab complied. 2 Samuel 11:14-21. The case before the Court has several Joabs, one of

2

whom is Defendant Christina Whorton. Whorton has filed a Motion to Dismiss, which for the reasons stated in this Memorandum should be denied.

What Todd Holtzman – a local big-shot, and a prominent and wealthy scion of Mt. Jackson royalty, with deep ties to the town's government and police department, *see* Complaint, ECF#001 at ¶¶ 56-60, 122, did to Plaintiff Luke Wilson was not as bad as what King David did, but it was worse than what the rich man of the parable did. Taking someone's house and having him thrown in jail is not as bad as murder, but it is worse than stealing an ewe lamb. That said, Holtzman's abuse of power was at least as bad as King David's. Like King David, Holtzman saw something to which he had no right, and made up his mind that he would have it. Like King David, Holtzman deprived a less-powerful person of things to which the other person *did* have a right. Like King David, Holtzman used the levers of official power for his own personal gain. And, like King David, Holtzman used his influence to draw government officials into his scheme. One of those drawn in was Police Officer Christina Whorton.

What makes the conspiracy among public servants that was instigated by Holtzman particularly egregious is the context of COVID-19. He put his plan into motion in July 2020, *see* Complaint, ECF#001, ¶¶ 27-35, and the events described in the Complaint culminated in August 2020 with the foreclosure sale and Wilson's false arrest, *see Id.* at ¶¶ 38, 39, 77-83. We should not forget that during those months, the greatest global crisis of our lifetimes was in full swing. From coast to coast, the public health crisis and resulting economic crisis were also causing a

housing crisis. In response, elected officials and public servants everywhere were working overtime to keep as many people in their homes as possible. In many places, rental and mortgage assistance programs were instituted, and moratoria on evictions and foreclosures were imposed. Holtzman, however, had no such public-minded impulse. To the contrary, he convinced officials charged with promoting the common good to instead work for Holtzman's own private good. He sought to use the pandemic as an opportunity to add to his own small-time empire – and the other Defendants, including Officer Whorton, helped him to do just that.

The issue here is whether Wilson has stated viable legal claims against Whorton under 42 U.S.C. § 1983 and other authorities as laid out in Wilson's Complaint. Wilson argues that he has, for the reasons set out below. Wilson therefore respectfully asks this Court to deny Whorton's Motion to Dismiss as well as all other pending dispositive motions, and for such other relief as this Court considers just.

## II. FACTS

Plaintiff Luke Wilson was the owner-inhabitant of a single-family home at 6091 Main Street in Mt. Jackson, Virginia. *See* Complaint, ECF#001 at ¶ 18. Unfortunately, soon after purchasing it, Wilson became ill and suffered a resulting loss of income. *See Id.* at ¶ 20. He fell behind on the installment payments he owed on the home. *See Id.* at ¶ 22. Around the same time, local big-shot Todd Holtzman decided that he wanted to own the 6091 Main Street property. *See Id.* at ¶ 28. But Wilson refused to sell his home to Holtzman. *See Id.* at ¶ 30. Refusing to take "no"

4

for an answer, Holtzman – an important and influential member of the community, *see Id.* at ¶¶ 56-60 – persuaded the mortgagee to institute foreclosure proceedings against Wilson, *see Id.* at ¶ 35. While Holtzman was awaiting Friday, August 14, 2020 – the date set for the foreclosure sale – he plotted with Police Chief Jeff Sterner to secure 6091 Main Street for himself as quickly as possible; Holtzman and Sterner also plotted to lay a trap for Wilson that they hoped would result in Wilson's arrest – a little bit of revenge against one who had had the temerity not to submit to Holtzman's demands. *See Id.* at ¶¶ 38, 49-54, 61.

Officer Whorton first enters on the stage of this drama on the day of the foreclosure sale, Friday, August 14, 2020. Around the time the foreclosure sale was being conducted, Chief Sterner and Sergeant Keith Cowart were assigning a very special project to Officer Whorton: To patrol 6091 Main Street nearly constantly. *See Id.* at ¶¶ 61-62. Officer Whorton was also ordered to watch 6091 Main Street for any sign of Wilson. *See Id.* Finally, Sterner and Cowart ordered Whorton to contact Todd Holtzman if she spotted Wilson on the property, and to follow whatever instructions Holtzman gave her. *See Id.* at ¶ 63.

The assignment Whorton received from Sterner and Cowart should have struck her as strange for two reasons. First of all, the order to stay in contact with Holtzman and to take direction from him was strange because he was not part of the chain of police command. An order to take directions from a powerful person who was not even in the police department chain of command would have raised a red flag for any reasonable law enforcement officer.

5

The second reason the assignment given to Whorton by Sterner and Cowart should have struck her as strange was that the instructions were inconsistent with the law of eviction and orders to vacate – an area of law with which Whorton was intimately familiar. Before accepting a position with the Mt. Jackson Police Department, Whorton had worked as a deputy sheriff in the Shenandoah County Sheriff's Office. *See* Complaint, ECF#001, at ¶ 70. There, she was responsible for reviewing and enforcing eviction notices and orders to vacate, including those arising out of foreclosure of property. *See Id.* For these reasons, Whorton would have had knowledge of Virginia's statutes on unlawful detainer, termination notices, and writs of possession, including VA Code Ann. § 8.01-126, which, as explained below in Part IV, clearly established Wilson's entitlement to possession of 6091 Main Street even after the completion of the foreclosure sale on Friday the 14th.

Yet, despite the red flags and her legal knowledge, Whorton blithely undertook the assignment. She patrolled 6091 Main Street at least eight times over the course of the weekend of Friday, August 14 through Sunday, August 16. *See* Complaint, ECF#001, at ¶ 64. She also made sure to check on the house as her last on-duty act before going home at the end of her shift each day. *See Id.* at ¶ 65.

It is important to understand how slowly the events described in the Complaint were developing. Wilson was out of town at the time of the foreclosure sale on Friday the 14th, *see Id.* at 49, and he did not enter 6091 Main Street to collect his personal belongings until late evening on Sunday the 16th, *see Id.* at ¶

83. In other words, this was not a situation in which Officer Whorton unexpectedly stumbled upon an intruder and had to make a spur-of-the-moment decision; Whorton had at least two days of advance notice, and had been instructed to look for something and someone very specific. She would have had plenty of time to verify the facts of Wilson's case or, if necessary, to brush up on the law of unlawful retainer.

In short, to any reasonable police officer, the instructions received by Whorton would have seemed highly suspect. Having been directed to take orders from someone not part of the police department chain of command, she had been at the very least tipped off that her assignment had more to do with Holtzman's private business than with the town's public business. Moreover, a reasonable police officer with Whorton's experience of unlawful detainer issues would have known that her instructions were not consistent with the law. Given these anomalies, during the 48-plus hours between receiving these instructions and spotting Wilson at the property, a reasonable police officer would certainly have taken the time to verify the facts or to review the law. Nevertheless:

- Whorton never confirmed whether, as of the weekend of August 14-16, Holtzman had legal title or a possessory interest to 6091 Main Street, *see Id.* at ¶ 66, 73;

- Whorton never sought to confirm that an injunction preventing Wilson's return was in effect, *see Id.* at ¶ 73;

- Whorton never consulted Holtzman or anyone else with firsthand knowledge of the circumstances to

ascertain "the specifics of the situation," *see Id.* at ¶ 92;

- Whorton never investigated "whether [Wilson was] evicted or given a trespass notice or anything," *Id.* at ¶ 103; and

- Whorton never researched a simple but key legal question, "If you're foreclosed on today, does that automatically vacate your rights to the property?" *Id.* at ¶ 110.

Caught in the trap Holtzman and Sterner had laid for him, *see Id.* at ¶ 77-82, Wilson entered his home at 6091 Main Street late in the evening of Sunday, August 16, 2020, *see Id.* at ¶ 83. Just past midnight, Officer Whorton, who was following her instructions to patrol the property, noticed lights on in the house. *See Id.* at ¶ 85. Whorton approached Wilson and told him, incorrectly, that he was not allowed on the property. *See Id.* at ¶ 86. She tried to call Holtzman as she had been instructed to do, but failed to get ahold of him. *See Id.* at ¶ 88. Wilson responded by explaining that Holtzman had sent him a message, through his mother, that he had until Monday to remove items from the house of they would be thrown out. *See Id.* at ¶ 91. Whorton repeatedly told Wilson that she was not sure about the specifics of the situation, and that she needed to get in touch with Holtzman for instructions on how to proceed. *See Id.* at ¶ 92.

Whorton eventually got ahold of Holtzman. When she finally did talk to him, he expressed personal animus towards Wilson. He told Whorton that Wilson was from "a terrible family" and that Wilson and his friends were "the roughest bunch you ever saw." *See Id.* at ¶ 93. Over and over, Holtzman repeatedly told Officer

8

Whorton that the decision to arrest Wilson was not up to him – that is, Holtzman – but he also told Whorton that she "had no choice" but to do so. *See Id.* at ¶ 96.

Despite Holtzman's personal slurs against Wilson and adamant insistence that Whorton arrest him, Whorton was reluctant to do so, probably because of the suspicious circumstances surrounding the circumvention of the police department chain of command, and because of her knowledge of eviction laws she had gained through the experience of her previous job. After her call with Holtzman ended, she called Sergeant Cowart to confirm that she should arrest Wilson. *See Id.* at ¶ 101. She repeatedly told Coward that she "didn't know" the right course of action to take. *See Id.* at ¶ 102. She also admitted that she did not "know anything about whether [Wilson was] evicted or given a trespass notice or anything." *See Id.* at ¶ 103. Whorton also expressed doubt as to whether there was probable cause to arrest Wilson. *See Id.* at ¶ 104. Finally, she told Cowart that, in her view, the better course of action would have been to give Wilson a summons and get an arrest warrant at a later date – then she added, "but that's just" her opinion. *See Id.* at ¶ 106.

Whorton's words demonstrate that she knew perfectly well that what she was being asked to do was unlawful. Her own best judgment and her own conscience were telling her not to arrest Wilson. Nevertheless, she silenced her own judgment and conscience, and decided to listen to Holtzman instead. *See Id.* at ¶ 107. Resigning herself, she told Cowart she would arrest Wilson, and "[t]o heck with it, if I do the wrong thing, I do the wrong thing." *See Id.* at ¶ 108.

So, Whorton arrested Wilson and took him before a magistrate, where Wilson was charged with trespass and burglary. *See Id.* at ¶ 111, 112. Wilson spent a day and a half in jail before he could be bonded out. *See Id.* at ¶ 116.

## III. STANDARD OF REVIEW

On a Rule 12(b)(6) Motion to Dismiss, the Court's task "is to determine whether the facts alleged in the plaintiff's complaint are legally sufficient to state a claim upon which relief can be granted." *Fessler v. International Bus. Machines Corp.*, 959 F.3d 146, 151-52 (4th Cir. 2020) (internal citation omitted). The Court "assume[s] the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *Id.* at 152 (internal citation and quotation marks omitted). "To survive a motion to dismiss, . . . [courts] require only enough facts to state a claim that is plausible on its face." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed.2d 929 (2007) (internal quotation marks omitted).

## IV. ARGUMENT

Wilson's Complaint asserts both federal claims and state law claims against Police Officer Whorton; Whorton argues that all of them should be dismissed. This Memorandum will consider Wilson's federal claims first, and then his state law claims.

### A. *Wilson's Federal § 1983 Claims against Whorton*

#### 1. **Relationship between Wilson's federal claims and Virginia.**

The Complaint alleges that Whorton violated Wilson's right to be free of false arrest and his right to be free of malicious prosecution, both of which are guaranteed by the Fourth Amendment to the United States Constitution. The Complaint also alleges that Whorton violate Wilson's right to the equal protection of the laws, which is guaranteed by the Fourteenth Amendment to the Constitution. Whorton is therefore liable to Wilson under 42 U.S.C. § 1983, for a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.

In her Motion to Dismiss, Whorton argues that Wilson never was deprived of any constitutional rights. As further explained below, this is incorrect.

Even though the parties are arguing over whether *federal* rights, the question of whether Wilson was deprived of those rights turns largely on *state* law. This is because what made the arrest an unconstitutional *false arrest* was the complete lack of basis for the arrest in Virginia law. What made the prosecution an unconstitutional *malicious prosecution* was the complete lack of basis for the prosecution in Virginia law. Finally, while Wilson's right to equal protection under the laws is secured by the federal Fourteenth Amendment, the specific *law* whose protection was denied to Wilson was a Virginia law.

Specifically, Wilson was denied the protection of VA Code Ann. § 8.01-126(D)(4), found in the part of the Virginia Code that governs civil procedure in unlawful entry and detainer cases. It reads, in pertinent part:

> If, on the date of a foreclosure sale of a single-family residential dwelling unit, the former owner remains in

> possession of such dwelling unit, *such former owner becomes a tenant at sufferance*. Such tenancy may be terminated by a written termination notice from the successor owner given to such tenant *at least three days prior to the effective date of a termination. Upon the expiration of the three-day period,* the successor owner *may file an unlawful detainer under this section*. Such tenant shall be responsible for payment of fair market rental from the date of such foreclosure until the date the tenant vacates the dwelling unit . . . .

*Id.* (emphasis added). The language of § 8.01-126(D)(4) is remarkably clear: A foreclosed-upon homeowner who remains in his home after a foreclosure becomes a kind of tenant – not a tenant with a written lease, but a tenant nonetheless. The purchaser at the foreclosure sale – who now, by operation of law, is the landlord – then has a choice to make: terminate the tenancy, or allow the tenancy to continue. Conceivably, a purchaser/landlord could permit the automatic tenancy to carry on indefinitely, without a written lease, with the tenant paying fair market rental, in a situation somewhat analogous to the one contemplated in VA Code Ann. § 55.1-1204(C). Unlike a landlord in the latter scenario, however, a purchaser/landlord under § 8.01-126(D) *always* has the option of terminating the automatic tenancy on three days' notice. That said, § 8.01-126 makes clear that a three-day termination notice is the *only* way of terminating the automatic tenancy created when an owner-inhabited, single-family home is foreclosed upon; the statute admits of no other possibility. And then the purchaser/landlord must seek an unlawful detainer and follow all required related procedures and steps to obtain a writ of possession.

The meaning of § 8.01-126 is clear on its face. But an in-depth examination of a key term in the statute – "tenant at sufferance" – further confirms this common-

sense reading. While "tenant at sufferance" is not defined in the statute itself, it is a part of the centuries-old common-law tradition that serves as the statute's backdrop. The best recent recounting of how, at common law, one usually became a tenant at sufferance is found in *Tran v. Lewis*, Record No. 201240, 2021 WL 4468441 at *1 (Va. Sept. 30, 2021):

> Once a tenant voluntarily holds over after the expiration of a lease, she becomes a tenant at sufferance, and thereafter the landlord has the option of evicting her or of converting her occupancy into another form of tenancy. If he landlord permits the tenant to remain, the tenant has an obligation to pay rent while she occupies the premises.

*Id.* (internal quotation marks and citations omitted). *Tran* further points out, *see Id.*, that "[t]he Virginia Residential Landlord and Tenant Act codifies these [common-law] principles" at VA Code Ann. § 55.1-1253(C), though that statute dispenses with the antiquated term "tenant at sufferance" in favor of the more modern "hold-over tenant." Importantly, a landlord who wishes to recover possession from a tenant at sufferance *must* bring an action in court; self-help is not a permissible option. *See* VA Code Ann. § 55.1-1253(B), §55.1-1252.

Several hundred years ago, self-help – even to the point of entering the property and using reasonable force – would have been an option for a landlord seeking to recover possession from a tenant at sufferance. But such has not been the case for many years. As the Virginia's Supreme Court (then known as the "Supreme Court of Appeals") explained in *Southern Ry. Co. v. Lima Wood & Coal Co.*, 156 Va. 829, 832-33, 159 S.E. 69, 70 (1931):

> Under the ancient law of England, the rightful owner of land could take what was his and reckon not the consequences. He could evict the one in possession and use force in doing so. . . . Now, this situation grew out of the peculiarities of feudal tenure, and it is not strange that under such a system, when title and possession were in fact more nearly the same thing than at present, the law should have allowed a greater latitude for the recovery of one's own that it should at this date, when ample and reasonably speedy remedies are afforded. . . .
>
> In the reign of Richard II parliament abrogated the right to so recover property by the enactment of the first unlawful entry statute recorded in English-speaking countries. Statutes of similar general import are in force in many, if not all, of the States, and such a statute has been in effect in Virginia since 1789. The object of the legislation was to prevent breaches of the peace and bloodshed. In many cases, the person in possession, although in fact without the title, may entertain the *bona fide* belief that through adverse possession, or otherwise, he owns the land. If the real owner of the title were allowed to be his own judge and to enforce his own judgment by force, the usual result would be an affray of the most serious kind, for man instinctively defends what he possesses, as well as what he owns. With the end in view of preventing violence and disturbances, the law has said, even to the owner, that you may not take what is yours by force . . . .

In modern times, self-help ejection is prohibited by at least two Virginia statutes. The first is VA Code Ann. § 55.1-1252, which applies in the more familiar situation of a residential lease that has expired or that has been lawfully terminated, but the tenant holds over; the second is the statute at issue here, § 8.01-126(D)(4).

Under § 8.01-126(D)(4), when Holtzman purchased the home at 6091 Main Street, Wilson became a tenant at sufferance – not a trespasser, not a squatter, not an adverse possessor, but a *tenant* at sufferance. As a tenant at sufferance, Wilson

retained the right of possession until such tenancy was terminated. And it could be terminated, not by the posting of no trespassing signs, not by making threatening phone calls to Wilson's mother, and not by arresting Wilson, but *only* by delivery of a three-day notice and subsequent court proceedings for an unlawful detainer.

There is no question but that Wilson's right of possession was tenuous. But, however tenuous, it was a right afforded him by Virginia law. For these reasons, there was absolutely no basis in Virginia law to arrest and prosecute Wilson for trespass and burglary of his own house, which he still possessed.

### 2. Whorton is not entitled to qualified immunity.

Whorton's Motion to Dismiss correctly points out that, if her conduct is protected by qualified immunity, she cannot be held liable under § 1983. As her memorandum points out, a qualified immunity analysis "involves a two-step inquiry, asking first whether a constitutional violation occurred and second whether the right violated was clearly established." *Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012). Finally, Whorton's memorandum correctly points out that, if Whorton had probable cause to arrest Wilson for trespass or burglary, then no constitution right was violated; this is because the Fourth Amendment does not guarantee the right to be free from *any* warrantless arrest, but only from warrantless arrests unsupported by probable cause. *See, e.g., Brooks v. City of Winston-Salem*, 85 F.3d 178, 181 (4th Cir. 1996).

But, contrary to Whorton's arguments, she did not have probable cause to arrest Wilson on the night of Sunday, August 16, 2020. "To determine whether an

officer had probable cause for an arrest, . . . [a court] examine[s] the events leading up to the arrest, and then decide[s] whether these historical facts viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586, 199 L.Ed.2d 453 (2018) (internal citations and quotation marks omitted). "Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." *Id.* (internal citations and quotation marks omitted). "[A]n officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." *Bell v. Neukirch*, 979 F.3d 594, 603 (8th Cir. 2020) (internal quotation marks and citation omitted). Officers "have a duty to conduct a reasonable thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances and so long as law enforcement would not be unduly hampered if the agents wait to obtain more facts before seeking to arrest." *Id.* at 604 (quotation marks and citations omitted). Moreover, "[t]he Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes – whether of fact or of law – must be *objectively* reasonable. We do not examine the subjective understanding of the particular officer involved. . . . Thus, an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce." *Heien v. North Carolina*, 574 U.S. 54, 66-67, 135 S. Ct. 530, 539-40, 190 L. Ed.2d 475 (2014) (internal citation omitted; emphasis in original).

In light of this proper understanding of how probable cause works, it is clear that no objectively reasonable police officer standing in the shoes of Officer Whorton would have thought that arresting Wilson was justified. Clearly, one cannot be guilty of trespassing into or burglarizing one's own home, so the real question here is whether Whorton could have reasonably suspected that 6091 Main Street was no longer in Wilson's possession. Under the circumstances alleged in the Complaint, she could have had not held such a suspicion – at least, not reasonably. She knew that the foreclosure sale had occurred on Friday, August 14th and that, under VA Code Ann. § 8.01-126(D)(4), and that it simply impossible, under VA Code Ann. § 8.01-126(D)(4) and simple arithmetic, for Wilson's tenancy at sufferance to have been terminated so quickly. Moreover, after having been told to accept orders from Holtzman, someone who not part of the police department chain of command, a reasonable officer would have suspected that the assignment at hand was purely for Holtzman's personal benefit, making the information Holtzman provided to Whorton extremely unreliability. Most importantly, an objectively reasonable officer would have quickly and easily cleared up the facts of the situation, by going to the courthouse and checking to see if an injunction against Wilson's entry had ever been entered. In short, any objectively reasonable officer would have known that an arrest of Wilson was unjustified – and Whorton's own prolonged hemming and hawing shows that, in fact, *she* knew it, too. For these reasons, there was no probable cause to arrest Wilson, and his constitutional rights to be free of false arrest were violated.

Moreover, the constitutional rights that Whorton violated were clearly established. As explained above, the text of VA Code Ann. § 8.01-126 is remarkably clear, and the cases Whorton cites in her memorandum to cast doubt on that clarity are not on point.

For instance, Whorton cites *Epperson v. Smith*, 836 F. App'x 127 (4th Cir. 2020) (unpublished opinion). The problem with *Epperson* is that, despite the 2020 date of the unpublished appellate opinion, the events giving rise to *Epperson* happened in autumn of 2015. *See Epperson v. Smith*, Case No. 4:16-cv-00050, 2018 WL 2470735 at *1 (W.D. Va. May 31, 2018) ("[O]n October 19, 2015, Plaintiffs' home was sold to Calvin and Vickie Payne . . . ."). But the part of VA Code Ann. § 8.01-126 that converts a mortgagor into a tenant at sufferance at the moment the hammer drops at the foreclosure sale did not become effective until July 1, 2018. *See* VA Code. Ann. § 8.01-126 (2017 and all earlier versions). In other words, the law was completely different at the time of the events that gave rise to *Epperson*; its expansive language suggesting that all of a mortgagor's "property rights are extinguished" at the time of the foreclosure sale is out of date.

 Whorton also cites *Williams v. Nathan*, Civ. A. No. 93-90-A, 1993 WL 219516, *5 (E.D. Va. Mar. 19, 1993) for the proposition that after a "default and resulting foreclosure, . . . [a mortgagor] no longer has any possessory interest in the property." But what Whorton conveniently neglects to mention was that, in the facts under consideration in *Williams*, a state court *had* entered an order enjoining the mortgagor from reentering the property – whereas, here, there was no such

injunction in effect. *See* Complaint, ECF#001, at ¶ 47. Finally, like the events giving rise to *Epperson*, the events that gave rise to *Williams* happened well before § 8.01-126 was amended to include current subsection (D)(4).

Another case cited by Whorton, *Phillips v. Munson*, 21 Va. Cir 531 (Shenandoah County Circuit Court 1982), is even further off-point because in that case, what was at issue was the mortgagor's continued timber interests – a property interest utterly separate from a *possessory* interest, which is the only kind of interest Wilson argues was secured to him under § 8.01-126(D)(4). And, yes, *Phillips*, too, was decided long before § 8.01-126(D)(4) was amended to include the subsection at issue here.

In short, in August 2020, Wilson's right to continue to possess 6091 Main Street was clearly established by the easily understandable text of § 8.01-126(D)(4). Whorton's efforts to cast doubt on the statute's clarity after the fact, by digging up older, off-point cases, do not render § 8.01-126(D)(4) unclear.

### 3. Wilson has alleged that he was treated differently from similarly situated individuals.

The only argument that Whorton raises in opposition to Wilsons equal protection claim is that "Plaintiff fails to identify any similarly situated individual. . . . Plaintiff simply states in a wholly conclusory manner that he was treated differently." Memorandum in Support of Motion to Dismiss, ECF#024, at 10. But Whorton cites no cases requiring a plaintiff to specifically identify and tell the stories of similarly situated individuals in their equal-protection complaints.

No doubt, if Wilson had pleaded only that similarly situated individuals had been treated differently, with nothing more, that would not be enough to satisfy the requirements of *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, L. Ed. 2d 868 (2009) or of *Twombly*. But Wilson *does* include more. Wilson has explained why, under Virginia law, he retained possession of his home even after the conclusion of the foreclosure sale. More importantly, he has related in painstaking detail why a Mt. Jackson big-shot and the town's police department conspired to deprive Wilson of those rights – *i.e.*, because Holtzman was greedy for Wilson's property, and because he wanted to take revenge on Wilson. It is a unique motivation on the part of Holtzman, specific to Wilson, that Wilson has alleged. The clear implication is that Holtzman and the police department would not treat similarly situated individuals in the same way, because Holtzman would not have the same base motivation as to the other individuals.

If, during discovery, Defendants wish to try to adduce evidence that Holtzman is greedy for *every* Mt. Jackson citizen's property and wants revenge on *every* Mt. Jackson citizen and, thus, every similarly situated individual would have been treated the same way as Wilson, they are certainly free to try to do so – though that would be a curious strategy to say the least. For now, at the pleading stage, Wilson's 30-page, 222-paragraph Complaint contains more than enough facts to plausibly allege a denial for Wilson's 14th Amendment equal-protection rights.

### 4.  Wilson has alleged a conspiracy under 42 U.S.C. § 1985

Whorton's only argument for why she should not be liable for conspiracy under 42 U.S.C. § 1985 is that Wilson has not alleged facts sufficient to show a "meeting of the minds." This is not so. "[A] plaintiff need not show that such an agreement was express; a conspiracy may be implied from the circumstances." *Hunt v. Weatherbee*, 626 F. Supp. 1097, 1107 (D. Mass. 1986) (internal citation and quotation marks omitted). "A conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct." *Abdi v. Brookhaven Science Assocs.*, 447 F. Supp. 2d 221, 226-27 (E.D.N.Y. 2006).

Here, Wilson has alleged sufficient facts to show that Whorton at least tacitly agreed to participate in Holtzman's scheme. Holtzman was more than just someone reporting to Whorton that a crime had happened; all of the circumstances known to Whorton pointed to the fact that *Holtzman* was trying to call the shots to get Wilson arrested. All of Whorton's hemming and hawing demonstrate that she knew there was no valid legal reason to arrest Wilson – yet she gave in to Holtzman's orders and arrested him anyway. The best interpretation of the facts alleged in the Complaint was that Holtzman was sending a message to Whorton, that Whorton got the message, and Whorton acquiesced – and that is a meeting of the minds.

### B.   Wilson has alleged claims under the Virginia Constitution

Whorton argues that Wilson's state constitutional claims fail for two reasons. First, she complains that Wilson has not identified the specific sections of the Virginia constitution that were violated. For the record, the specific sections are Article 1, Section 10 (which is analogous to the Fourth Amendment of the federal

Constitution) and Article 1, Section 11 (which is analogous to Fourteenth Amendment of the federal Constitution).

Whorton's only other argument is that Wilson could not possibly have stated claims under the Virginia constitution, because Wilson's parallel federal constitutional claims are not viable. But since, for the reasons explained above, Wilson's federal constitutional claims *do* survive, his Virginia constitutional claims do, too.

## V. CONCLUSION

For these reasons, Plaintiff Luke Wilson respectfully asks this court to deny Police Officer Whorton's Motion to Dismiss, and for such other relief as this Court deems appropriate.

Dated:          December 20, 2021
                Brooklyn, New York


                                        /s/ Brian L. Bromberg
                                        Brian L. Bromberg
                                        One of Plaintiff's Attorneys

**Attorneys for Plaintiff**

David W. Silek (Virginia Bar No. 47409)
Sandground, West, Silek & Raminpour, PLC
8229 Boone Boulevard, Suite 610
Vienna, Virginia 22182
Telephone: (703) 361-9700
Fax: (571) 327-3311
Email: dsilek@sileklaw.com

Thomas R. Breeden (Virginia Bar No. 33410)
Thomas R. Breeden, P.C.
10326 Lomond Drive
Manassas, Virginia 20109

Telephone: (703) 361-9277
Fax: (703) 337-0441
Email: trb@tbreedenlaw.com

Brian L. Bromberg (admitted *pro hac vice*)
Bromberg Law Office, P.C.
352 Rutland Road #1
Brooklyn, New York 11225
Telephone: (212) 248-7906
Fax: (212) 248-7908
Email: brian@bromberglawoffice.com

## Certificate of Service

I hereby certify that on December 20, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Brian L. Bromberg
Brian L. Bromberg