Exhibit A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

———————————————————————x

LUKE WILSON,                                    :
                                                :
                              Plaintiff          :        No. 5:21-CV-00055-TTC
                                                :
              -against-                         :
                                                :        AMENDED COMPLAINT AND
                                                :        JURY DEMAND
                                                :
THE TOWN OF MOUNT JACKSON, CHIEF                :
OF POLICE JEFF STERNER, SERGEANT                :
KEITH COWART, and POLICE OFFICERS               :
CHRISTINA WHORTON, ROBERT YOUNG                 :
and MARK JOHNSON of the MOUNT                   :
JACKSON POLICE DEPARTMENT, and                  :
TODD HOLTZMAN,                                  :
                                                :
                              Defendants,        :
———————————————————————x

## PRELIMINARY STATEMENT

1.     This is an action for monetary damages (compensatory and punitive)
against the Town of Mount Jackson ("The Town" or "Mt. Jackson"), Chief of Police
Jeff Sterner, Sergeant Keith Cowart, and Police Officers Christina Whorton, Robert
Young, and Mark Johnson (collectively, the "Police Officer Defendants"), and Todd
Holtzman arising out of the false arrest, malicious prosecution, and defamation of
Plaintiff Luke Wilson.

2.     Wilson, like many Americans over the last couple of years, fell into
financial difficulty as a result of the pandemic and one of his properties was
foreclosed.

3.     As soon as the foreclosure auction of Plaintiff's property was completed, but before the legal title to the property had changed hands by virtue of a deed being recorded, Holtzman and the Town conspired to arrest Plaintiff on false grounds, namely that he was trespassing on property that Holtzman knew, and the Police Officer Defendants knew or should have known, was still in Plaintiff's possession.

4.     As a result of Defendants' actions, Wilson was arrested without probable cause, forced to spend one-and-a-half days in jail, and charged with a felony.

5.     The Police Officer Defendants, acting under the color of state law, intentionally and willfully subjected Plaintiff to, *inter alia*, false arrest, violations of equal protection, malicious prosecution, and failure to intervene, for acts of which plaintiff was innocent in violation of plaintiff's rights under the Fourth and Fourteenth Amendments of the United States Constitution.

6.     Holtzman unlawfully defamed, falsely imprisoned, and maliciously prosecuted Plaintiff. Holtzman also trespassed on Plaintiff's property – the very crime that he falsely accused Plaintiff of committing – converted Plaintiff's chattels on that property, and unlawfully detained the property and unlawfully ejected Plaintiff from the property. Holtzman conspired with the Police Officer Defendants to commit each of these torts. Holtzman also intentionally inflicted emotional distress on Plaintiff.

## JURISDICTION

7.      This action is brought under 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. §§ 1983, 1985 and 1988 and the Fourth and Fourteenth Amendments to the Constitution of the United States.

8.      Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over plaintiff's state law claims because these claims closely relate to the constitutional claims, having arisen out of a common nucleus of operative facts, such that all claims form part of the same case or controversy.

9.      Venue is laid within the United States District Court for the Western District of Virginia in that at least one Defendant resides and does business within the boundaries of the Western District of Virginia, and Defendants are residents of the Commonwealth of Virginia. Venue is also proper because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the Western District of Virginia.

## PARTIES

10.      Plaintiff Luke Wilson at all times relevant hereto is and has been a resident of Mt. Jackson, Virginia.

11.      Defendant Mt. Jackson is at all times relevant hereto a municipal corporation duly organized and existing under the laws, statutes, and charters of the Commonwealth of Virginia.

12.      The Mt. Jackson Police Department ("MJPD") is at all times relevant hereto an agency of Defendant Mt. Jackson.

13.     Defendants Jeff Sterner, Keith Cowart, Christina Whorton, Robert Young, and Mark Johnson, at all times relevant to these allegations, were employees of Defendant Mt. Jackson, employed as police officers with the MJPD.

14.     At all times mentioned herein, the Police Officer Defendants were acting under color of state and local law, to wit, under color of statutes, ordinances, regulations, policies, customs and usages of Mt. Jackson and the Commonwealth of Virginia.

15.     All Police Officer Defendants identified in this Complaint are so named in their individual and official capacities as employees of Defendant Mt. Jackson. The Police Officer Defendants undertook each and all of the acts alleged in this Complaint under cover and pretense of the statutes and laws of the Commonwealth of Virginia, and by virtue of their authority as police officers and employees of Defendant Mt. Jackson.

16.     Defendant Todd Holtzman at all times relevant hereto is and has been a resident of Mt. Jackson, Virginia.

## FACTUAL ALLEGATIONS

17.     Wilson is an army veteran and a licensed plumber with his own plumbing business.

18.     In or around August 2019, Wilson purchased a house at 6091 Main Street in Mt. Jackson.

19.     Wilson entered into an agreement with the former owner of the house to pay off the $200,000 purchase price in installments, including a $50,000 down payment over five months.

20.     Shortly after completing the purchase, Wilson got sick, which prevented him from earning income through his plumbing business.

21.     Then his business saw a significant decline as a result of the pandemic.

22.     As a result, Wilson fell behind on his payments to the former owner.

23.     Wilson also owned an adjoining property that contained an abandoned mill, which he had purchased in or around February 2018.

24.     Wilson is still the owner of the mill and is current on his payments for that property.

25.     Shortly after Wilson had purchased the mill, Holtzman approached Wilson and asked if he could inspect the property with a view to potentially buying it from Wilson.

26.     Wilson showed Holtzman the property, but Holtzman never made a formal offer to purchase the mill.

27.     In or around July 2020, Holtzman contacted Wilson again.

28.     Holtzman told Wilson that he would be purchasing both the house at 6091 Main Street and the mill.

29.     Holtzman did not make an offer to purchase these properties, he stated as fact that he would purchase them.

30.     Wilson told Holtzman that he had no intention of selling either property

31.     Holtzman told Wilson that he should focus on plumbing rather than property.

32.     Just a couple of days later, the mortgagee for the mill informed Wilson that Holtzman had come to her attempting to buy the mill directly from her even though Wilson was the owner and was still current on payments.

33.     The mortgagee had shown Holtzman the property again and afterwards she called Wilson to apologize for letting Holtzman onto Wilson's property without his permission.

34.     Wilson later received a letter, dated July 14, 2020, from an attorney for the former owner and mortgagee for the 6091 Main Street house informing him that he was in default and that a foreclosure sale would proceed on August 14, 2020. A copy of that letter is attached hereto as <u>Exhibit A</u>.

35.     On information and belief, the former owner and mortgagee sent this letter upon the encouragement and advice of Holtzman.

36.     On or about August 13, 2020, Holtzman and a few of his employees entered the 6091 Main Street property and inspected it.

37.      They did not have permission to enter the property and were trespassing.

38.     Those foreclosure proceedings culminated with a foreclosure auction on or about August 14, 2020.

39.     Holtzman purchased Wilson's house at the foreclosure auction for $61,500.

40.     A foreclosure auction, much like any other auction of real property, does not result in the instantaneous transfer of title.

41.     Rather, a deed must be prepared and recorded among the land records in order for the title to the property to be transferred. Further, even when title is transferred, if the former owner is in possession of the property, they still have a possessory interest as a tenant until that tenancy is terminated. As of the date of sale, then, Wilson still had a possessory right to his house.

42.     Holtzman knew that he did not yet have title to the property.

43.     Holtzman knew that he did not yet have a possessory interest in the property, but instead, if Wilson did not voluntarily vacate the property, he would have to seek an unlawful detainer and writ of possession in order to obtain possession of the property.

44.     Holtzman regularly purchases properties in the Mt. Jackson and Shenandoah County area and is familiar with the procedures associated with purchasing property, registering deeds, and obtaining possession.

45.     Holtzman did not register the deed until September 11, 2020. A copy of the deed as recorded in the Shenandoah County Clerk's Office is attached hereto as Exhibit B.

46.     On the same date as the foreclosure sale, the Circuit Court of Shenandoah County granted an injunction barring Wilson from returning to the

6091 Main Street property and from taking anything off the property until

September 10, 2020, conditional on payment of a $1,000 bond. In other words, if the

bond was not paid, then Wilson would retain possession until further order of the

Court. A copy of the Court's order is attached hereto as Exhibit C.

47.    Neither the mortgagee nor Holtzman ever paid this bond and the

injunction never went into effect.

48.    Instead, Holtzman coordinated with the MJPD to get Wilson arrested

for trespassing on what was still legally Wilson's own property, and for which

Wilson still retained a possessory interest.

49.    For the first step in Holtzman's plan, he took advantage of the fact

that Wilson was away from Mt. Jackson at the time of the foreclosure sale and he

hired people to enter Wilson's property, place locks on the doors, nail the doors shut,

and install prominent "No Trespassing" signs.

50.    He took this action upon the advice of Chief of Police Sterner.

51.    Chief Sterner told Holtzman that putting up the signs would allow

Chief Sterner and other police officers to arrest Wilson for breaking and entering

and criminal trespass if Wilson returned to the property.

52.    Holtzman did not have the permission of Wilson or anyone else to take

this action.

53.    For the second step, Holtzman coordinated with the MJPD to ensure

that Wilson would be arrested if he returned to the property, which Wilson still

legally owned and in which he still retained a possessory interest.

54.     Holtzman and/or his agents spoke directly with Chief Sterner about patrolling Wilson's house to catch him trespassing.

55.     Holtzman has strong connections to the MJPD.

56.     His father, William Holtzman, is a prominent local figure who has made large donations to Mt. Jackson civic causes.

57.     William Holtzman is the founder and President of Holtzman Oil Corp.

58.     The MJPD operates out of the "William and Ken Byrd Holtzman Visitors Center and Town Hall," named after Holtzman's family members because of their contribution to its construction.

59.     Holtzman himself is the General Manager of Holtzman Propane, a subsidiary of his father's company that focuses on the sale and distribution of propane products.

60.     Holtzman is also a major property-developer within the Mount Jackson area.

61.     Holtzman directed the MJPD to conduct a near-constant patrol of Wilson's house for any sign of his return.

62.     Chief Sterner and Sergeant Cowart assigned that responsibility to Officer Whorton.

63.     Chief Sterner and Sergeant Cowart also directed Officer Whorton to contact Holtzman if she found Wilson on the property and to act in accordance with Holtzman's instructions as to how to deal with Wilson.

9

64.   Officer Whorton patrolled the house at least eight times over the course of a single weekend.

65.   Officer Whorton also made sure to check on the house as her last on-duty act before going home.

66.   None of the Police Officer Defendants confirmed whether Holtzman had legal title or a possessory interest to 6091 Main Street.

67.   Had they done so, they would have known that Holtzman had no right to enter that property or to exclude Wilson from that property.

68.   The Police Officer Defendants knew or should have known that title to property does not get transferred immediately upon sale.

69.   The Police Officer Defendants knew or should have known that individuals residing in a residence which is foreclosed on retain a possessory interest until that possessory interest is terminated. In other words, the Police Officer Defendants knew or should have known that in order to evict a former owner from a property, a foreclosure purchaser must provide a notice of termination of at will tenancy, file and serve a Summons for Unlawful Detainer, obtain a court order in their favor on the Summons for Unlawful Detainer, file a Writ of Possession, and have the Writ of Possession served on the former owner.

70.   The relevant statute in this regard is Virginia Code Ann. § 8:01-126(D)(4), which provides as follows:

> If, on the date of a foreclosure sale of a single-family residential dwelling unit, the former owner remains in possession of such dwelling unit, such former owner becomes a tenant at sufferance. Such tenancy may be terminated by a written termination notice from the successor owner given to such tenant at least three days

prior to the effective date of termination. Upon the expiration of the three-day period, the successor owner may file an unlawful detainer under this section. Such tenant shall be responsible for payment of fair market rental from the date of such foreclosure until the date the tenant vacates the dwelling unit, as well as damages, and for payment of reasonable attorney fees and court costs.

71. Officer Whorton formerly worked as a deputy sheriff in the Shenandoah County Sheriff's Office where she would have been responsible for reviewing and enforcing eviction notices and orders to vacate, including those arising out of the foreclosure of property.

72. At the time of Wilson's arrest, Officer Whorton told Wilson that the resident of a foreclosed property must leave once there is an injunction preventing that resident's return.

73. No such injunction was in effect at that time.

74. Despite her knowledge of the process, Officer Whorton took no steps to confirm whether an injunction was in place or whether Holtzman had legal title to the property at the time.

75. The Police Officer Defendants would not have expended these resources or failed to conduct basic due diligence for any other similarly situated person.

76. The Police Officer Defendants, acting on instruction from Holtzman, explicitly singled out Wilson.

77. The Police Officer Defendants would not have responded in the same way to any other similarly situated person.

78.     For the third step, Holtzman contacted Wilson's mother and told her that Wilson would need to clear out his house by end of the day of that Monday, August 17, 2020.

79.     After the foreclosure sale, Holtzman and Chief Sterner looked for Wilson together to inform him of the sale.

80.     Holtzman only spoke to Wilson's mother after he and Chief Sterner could not find Wilson.

81.     On information and belief, Sterner drove Holtzman around at Holtzman's direction.

82.     Holtzman conveyed his message to Wilson's mother even though he still did not have legal title to the property and would not have that legal title by that Monday.

83.     In this manner, Holtzman was able to lure Wilson back to his house while also ensuring that the MJPD would be monitoring that house for any activity.

84.     Wilson's mother conveyed the Monday deadline to Wilson who returned to his house late on the evening of Sunday, August 16, 2020, to claim his property before Holtzman disposed of it.

85.     Wilson brought his girlfriend and another friend with him to help collect his personal property.

86.     It was past midnight when Officer Whorton, on another one of her required patrols of Wilson's house, noticed lights on at the house.

87.     Officer Whorton approached Wilson and told him that he was not allowed on the property.

88.     Wilson explained that he had return to the house to collect his personal property.

89.     Officer Whorton attempted unsuccessfully to contact Holtzman for his direction.

90.     Chief Sterner and Sergeant Cowart had ordered Officer Whorton to call Holtzman if she found Wilson at his house and to follow Holtzman's instructions.

91.     Officer Whorton told Wilson that he was not allowed to be on the property.

92.     Wilson explained that Holtzman had sent him a message, through his mother, that he had until Monday to remove his items from the house or they would be thrown out.

93.     Officer Whorton repeatedly told Wilson that she was not sure about the specifics of the situation but nevertheless needed to get in touch with Holtzman in order to see what action Holtzman wanted to take.

94.     When Officer Whorton eventually got a hold of Holtzman, he expressed personal animus towards Wilson. He told Officer Whorton that Wilson is from "a terrible family" and that Wilson and his friends were "the roughest bunch you ever saw."

95.     Holtzman then falsely accused Wilson of trespassing and causing criminal damage. He told Officer Whorton that Wilson "broke the law. He broke in." He said that Wilson "had every intention" of breaking the law.

96.     Holtzman also falsely accused Wilson of kicking in the doors of the house. This was not true and Holtzman had no basis for making the accusation.

97.     Holtzman repeatedly told Officer Whorton that arresting Wilson was not up to him but also that she "had no choice" but to do so.

98.     Officer Whorton, as she was instructed by Chief Sterner and Sergeant Cowart, agreed to follow Holtzman's directions.

99.     Officer Whorton presented Holtzman with two options for how to arrest and prosecute Wilson: she could expel Wilson from the property and seek a warrant for his arrest at a later date or she could just go ahead and arrest him then and there.

100.    Holtzman responded by telling Officer Whorton "I don't see any reason to wait. [Officer Whorton's] got him. He's there, in her possession."

101.    Holtzman then told Officer Whorton to lie to Wilson and tell Wilson that Holtzman had nothing to do with the decision to arrest him.

102.    Officer Whorton called Sergeant Cowart to confirm that course of action.

103.    She repeatedly told Sergeant Cowart that she "didn't know" the right course of action to take.

104.    Officer Whorton further admitted that she did not "know anything about whether [Wilson was] evicted or given a trespass notice or anything."

105.    Officer Whorton then expressed uncertainty to Sergeant Cowart as to whether there was probable cause but decided to go ahead and arrest Wilson anyway as Holtzman had directed.

106.    Sergeant Cowart did not prevent Officer Whorton from arresting Wilson without probable cause and, on information and belief, encouraged Whorton to make the arrest.

107.    Officer Whorton told Sergeant Cowart that her preference would be to give Wilson a summons and get an arrest warrant at a later date "but that's just" her opinion.

108.    Rather than follow her own sense of how best to proceed, Officer Whorton substituted Holtzman's judgment for her own.

109.    She told Sergeant Cowart that she would arrest Wilson and "[t]o heck with it, if I do the wrong thing, I do the wrong thing." And "if something comes up, they can always drop charges later."

110.    Officer Whorton then informed the other police officers at the scene, Robert Young and Mark Johnson, of the plan to arrest Wilson but not the other two people with him.

111.    One of the officers, Young or Johnson, asked Officer Whorton whether "If you're foreclosed on today, does that automatically vacate your rights to the

property?" and Officer Whorton responded that she did not know the answer to that question.

112.   Despite all of these uncertain questions and against Officer Whorton's own expressed preference, and despite her knowledge of the eviction process from her time in the sheriff's department, she nevertheless went ahead and arrested Wilson as Holtzman had directed.

113.   Officer Whorton took Wilson before a magistrate where he was charged with trespass and burglary.

114.   Officer Whorton falsely told the magistrate that Holtzman was the current owner even though he did not yet have legal title to the property.

115.   Burglary is a felony under Virginia law.

116.   Officer Whorton did not arrest the other two people with Wilson.

117.   Despite their apparent doubts as to the legality of the arrest and despite having an obligation to prevent unlawful acts and not to assist in unlawful acts, Young and Johnson assisted Officer Wharton in the unlawful arrest

118.   Furthermore, neither Young nor Johnson reported Whorton's illegal actions to the district attorney or to anyone with authority to prevent the injustice being perpetrated by Whorton and the other Defendants against Plaintiff.

119.   Wilson spent one and a half days in jail before he could be bonded out.

120.   Judge Amy B. Tisinger of the Shenandoah General District Court and Commonwealth Attorney Amanda Wiseley could not understand the basis for the

charges against Wilson and Judge Tisinger recommended that Wilson obtain counsel before the next court date.

121.    When Wilson next appeared in court, he was informed that all charges against him were dropped.

122.    The charges were dismissed through entry of an order of *nolle prosequi*.

123.    Following dismissal of the charges, the Mayor of Mt. Jackson and Chief Sterner arranged a meeting with Commonwealth Attorney Wiseley. At that meeting, the Mayor and Chief Sterner berated Commonwealth Attorney Wiseley for her exercise of prosecutorial discretion and demanded that she explain why she was not continuing to prosecute Wilson for entering property in which he still retained both a legal and possessory interest.

124.    The Mayor and Chief Sterner would not treat charges against another similarly situated individual the same way as they treated the charges against Wilson.

125.    The Mayor of Mt. Jackson is a part-time employee of Holtzman Oil Corp.

126.    After Wilson got out of jail, he arranged to remove his personal property from the 6091 Main Street house.

127.    When he went to get his property, he discovered that most of his personal property had been removed or thrown out.

128.    Holtzman and/or his agents had returned to 6091 Main Street and removed or thrown out Wilson's personal property while he had been in jail on false charges.

129.    On information and belief, Holtzman took some of Wilson's items in the house for his own personal use.

130.    Among the missing items at 6091 Main Street that belonged to Wilson were black-walnut lumber with a market value at the time of over $20,000 and a number of antiques worth a significant amount of money, such as a rug worth approximately $5,000 and 19th Century furniture that was also potentially worth thousands of dollars.

131.    Holtzman had also gotten rid of a bookcase that Wilson had built for his daughter.

132.    Holtzman took these actions even though title still had not been transferred and he lacked authority to enter the property.

133.    Holtzman complained about the loss of his property to Chief Sterner who told him that it was a civil matter and there was nothing Chief Sterner could do about it.

134.    Chief Sterner took the opposite approach to property crimes when, at Holtzman's direction, he ordered his subordinates to monitor the 6091 Main Street house for any sign of Wilson and advised Holtzman on how best to set up the arrest of Wilson.

135.    Chief Sterner did not treat Wilson as he did other similarly situated residents of Mt. Jackson and thereby deprived Wilson of the equal protection of the laws.

136.    As a result of Wilson's false arrest and malicious prosecution, he has felt depressed and ashamed. He has also found it mentally difficult to continue with his property projects and his plumbing business.

137.    Holtzman's defamatory accusation of criminal wrongdoing has damaged Wilson's reputation in the local community.

138.    Wilson's arrest was publicized on the official County website and his mugshot was published online.

139.    That mug shot has circulated through the Mt. Jackson community.

140.    The arrest and mugshot are still readily accessible online even though the charges lacked any merit and have been dropped.

141.    People Wilson knows have called him a thief because of Holtzman's false accusations.

142.    Wilson's distress is exacerbated by his belief that his plumbing business may not recover even after the pandemic ends because of the reputational damage.

143.    The effects of the unlawful arrest will likely follow Wilson around for the rest of his life.

## FIRST CAUSE OF ACTION
### (FALSE ARREST AND ILLEGAL IMPRISONMENT
### AGAINST THE POLICE OFFICER DEFENDANTS)

144.    Plaintiff repeats and realleges each and every allegation set forth

above as if reasserted and realleged herein.

145.   The Police Officer Defendants subjected plaintiff to false arrest, imprisonment, and deprivation of liberty without probable cause.

146.   The Police Officer Defendants have deprived plaintiff of his civil, constitutional and statutory rights and have conspired to deprive him of such rights and are liable to plaintiff under 42 U.S.C. §§ 1983 and 1985 and the Virginia Constitution.

147.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages alleged herein.

**SECOND CAUSE OF ACTION**
(EQUAL PROTECTION VIOLATION AGAINST
THE POLICE OFFICER DEFENDANTS)

148.   Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

149.   The Police Officer Defendants illegally arrested plaintiff subjecting him to false arrest, imprisonment and deprivation of liberty without probable cause and denied to Plaintiff the equal protection of the laws.

150.   The Police Officer Defendants intentionally singled out and targeted Wilson.

151.   In doing so, Mt. Jackson and the Police Officer Defendants treated Wilson differently from other, similarly situated people – i.e., others whose houses had been subject to a foreclosure sale.

152.   There was no rational basis for the Police Officer Defendants to have treated Wilson differently from other similarly situated people.

153.    The only reason for the discriminatory treatment of Wilson was the direction from Defendant Holtzman.

154.    As a result of the foregoing, the Police Officer Defendants have violated the right of Plaintiff to the equal protection of the laws.

155.    The Police Officer Defendants have deprived plaintiff of his civil, constitutional and statutory rights and have conspired to deprive him of such rights and are liable to plaintiff under 42 U.S.C. §§ 1983 and 1985 and the Virginia Constitution.

156.    As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages alleged herein.

### THIRD CAUSE OF ACTION
### (MALICIOUS PROSECUTION AGAINST
### THE POLICE OFFICER DEFENDANTS)

157.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

158.    The Police Officer Defendants instigated charges against Wilson without probable cause.

159.    Those charges were dismissed through entry of an order of nolle prosequi.

160.    The Police Officer Defendants acted with malice towards Plaintiff in arresting and charging him without probable cause.

161.   In charging Plaintiff with a felony without probable cause, the Police Officer Defendants violated Plaintiff's rights under the Fourth and Fourteenth Amendments of the United States Constitution.

162.   The Police Officer Defendants have deprived plaintiff of his civil, constitutional and statutory rights and have conspired to deprive him of such rights and are liable to plaintiff under 42 U.S.C. §§ 1983 and 1985 and the Virginia Constitution.

163.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages alleged herein.

<u>FOURTH CAUSE OF ACTION</u>
(FAILURE TO INTERVENE AGAINST
THE POLICE OFFICER DEFENDANTS)

164.    Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

165.   Those Police Officer Defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct, had an opportunity prevent such conduct, had a duty to intervene and prevent such conduct, and failed to intervene.

166.   Accordingly, the defendants who failed to intervene violated Plaintiff's rights under the Fourth and Fourteenth Amendments.

167.   The Police Officer Defendants have deprived plaintiff of his civil, constitutional and statutory rights and have conspired to deprive him of such rights

and are liable to plaintiff under 42 U.S.C. §§ 1983 and 1985 and the Virginia

Constitution.

168.    As a direct and proximate result of this unlawful conduct, plaintiff

sustained the damages alleged herein.

**FIFTH CAUSE OF ACTION**
(MUNICIPAL LIABILITY AGAINST MT. JACKSON)

169.    Plaintiff repeats and realleges each and every allegation set forth

above as if reasserted and realleged herein.

170.  Defendant Mt. Jackson is liable for the damages suffered by the

plaintiff as a result of the conduct of Chief of Police Sterner.

171.  Chief Sterner has final policymaking authority with respect to law

enforcement policies and actions within Mt. Jackson.

172.  To the extent that this policymaking authority is shared with, or can

be superseded by, the policymaking authority of the Town Manager or Council of

Mt. Jackson, final policymaking authority has been delegated to Chief Sterner.

173.  Chief Sterner, through his final policymaking authority, outsourced

police functions and enforcement efforts to a private citizen, Defendant Holtzman.

174.  Chief Sterner acted at the instruction of Holtzman and ordered his

subordinates to comply with the instructions of Holtzman regardless of whether

those instructions were consistent with the Police Officer Defendants' constitutional

duties.

175.  As a result of this decision, Chief Sterner and the Police Officer Defendants unlawfully arrested and maliciously prosecuted Plaintiff Wilson despite lacking probable cause.

176.  Mt. Jackson, through Chief Sterner, enabled the false arrest and malicious prosecution of Plaintiff Wilson.

177.  Mt. Jackson, through Chief Sterner, has deprived plaintiff of his civil, constitutional and statutory rights and has conspired to deprive him of such rights and is liable to plaintiff under 42 U.S.C. §§ 1983 and 1985 and the Virginia Constitution.

178.  As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages alleged herein.

**SIXTH CAUSE OF ACTION**
(DEFAMATION AGAINST HOLTZMAN)

179.  Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

180.  Defendant Holtzman orally stated to members of the MJPD that plaintiff was trespassing on Holtzman's property and that he had kicked in a door.

181.  Those statements were false.

182.  Defendant Holtzman was not authorized or otherwise privileged to make such false statements.

183.  By making the false statements, Defendant Holtzman was charging Plaintiff with a crime.

184. Defendant Holtzman's defamatory statements resulted in Plaintiff's false arrest and has caused Plaintiff substantial reputational harm within the community.

185. As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages alleged herein.

## SEVENTH CAUSE OF ACTION
### (FALSE IMPRISONMENT AGAINST HOLTZMAN)

186. Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

187. Defendant Holtzman caused the arrest of Plaintiff without probable cause.

188. As a result of Defendant Holtzman's conduct, Plaintiff was arrested and confined in jail for one and a half days.

189. Plaintiff was conscious of this confinement and did not consent to it.

190. Defendant Holtzman thereby restrained the liberty of Plaintiff without any sufficient legal excuse.

191. As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages alleged herein.

## EIGHTH CAUSE OF ACTION
### (MALICIOUS PROSECUTION AGAINST HOLTZMAN)

192. Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

193. Defendant Holtzman instigated charges against Wilson without probable cause.

194.   Those charges were dismissed through entry of an order of nolle prosequi.

195.  Defendant Holtzman acted with malice towards Plaintiff in causing him to be arrested and charged without probable cause.

196.  As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages alleged herein.

### NINTH CAUSE OF ACTION
(TRESPASS AGAINST HOLTZMAN)

197.  Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

198.  Defendant Holtzman and/or his agents entered onto Wilson's property without authorization.

199.  Defendant Holtzman and/or his agents placed locks on Wilson's property, nailed shut doors on Wilson's property, and installed signs on Wilson's property without authorization.

200.  Defendant Holtzman did not have any right to access Wilson's property without authorization until title had been transferred or until he paid the bond needed to obtain an injunction permitting him access.

201.  As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages alleged herein.

### TENTH CAUSE OF ACTION
(CONVERSION AGAINST HOLTZMAN)

202.  Plaintiff repeats and realleges each and every allegation set forth

26

above as if reasserted and realleged herein.

203.  Defendant Holtzman intentionally and without authority, assumed and exercised control over Plaintiff's property, interfering with his right to possession of the same, by preventing Plaintiff from collecting that property from his own house.

204.  Defendant Holtzman and/or his agents placed locks on Wilson's property and nailed shut doors on Wilson's property to prevent access to Wilson's personal property.

205.  Defendant Holtzman did not have any right to exercise control over Wilson's property without authorization.

206.  The conduct of Defendant Holtzman is gross, wanton or deliberate and demonstrates a high degree of moral culpability.

207.  As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages alleged herein.

## ELEVENTH CAUSE OF ACTION
### (UNLAWFUL DETAINER/EJECTMENT AGAINST HOLTZMAN)

208.  Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

209.  Defendant Holtzman forcibly and unlawfully entered onto Wilson's property.

210.  Defendant Holtzman maintained possession of Plaintiff's property even though title to the property had not yet been transferred.

211.  Plaintiff remained the rightful owner of the property until such time as title to the land was transferred.

212.  Defendant Holtzman did not seek or receive Plaintiff's consent to possess or exercise control over Plaintiff's property.

213.  Defendant Holtzman excluded Plaintiff from possession of Plaintiff's property by, among other things, placing locks on Plaintiff's property, nailing shut the doors on Plaintiff's property, installing no trespassing signs on Plaintiff's property, and having Plaintiff arrested on false charges when Plaintiff attempted to exercise possessory rights in the property.

214.  As a direct and proximate result of this unlawful conduct, Plaintiff lost the use and value of his property.

### TWELFTH CAUSE OF ACTION
(INTENTIONAL INFLICTION OF EMOTIONAL
DISTRESS AGAINST HOLTZMAN)

215.  Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

216.  Defendant Holtzman's conduct towards Plaintiff Wilson as alleged herein, including, but not limited to, orchestrating Plaintiff's arrest through provably false statements of fact to the police, was extreme and outrageous.

217.  Defendant Holtzman intentionally targeted Plaintiff Wilson as part of a campaign of harassment.

218.  Defendant Holtzman's conduct offends generally accepted standards of decency and morality.

219.  As a result of Defendant Holtzman's conduct, Plaintiff Wilson suffered severe emotional distress.

220.  Plaintiff continues to suffer emotional distress from Defendant Holtzman's conduct.

## THIRTEENTH CAUSE OF ACTION
### (COMMON LAW CONSPIRACY AGAINST HOLTZMAN)

221.  Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

222.  Defendant Holtzman together with Chief Sterner and the other Police Officer Defendants intentionally conspired, acted in unison and concert together, mutually undertook, planned and otherwise took joint action to commit the torts of defamation, false imprisonment, malicious prosecution, trespass, conversion, and unlawful detainer/ejectment against Plaintiff.

223.  Defendant Holtzman took overt acts in furtherance of the agreement as set forth above, specifically including, but not limited to, trespassing on Plaintiff's property; placing locks on the doors, nailing shut the doors, and putting up no trespassing signs upon the advice of Chief Sterner; directing Chief Sterner and the other Police Officer Defendants to patrol Plaintiff's property; luring Plaintiff back to the property with the threat of throwing out Plaintiff's personal property; and directing the Police Officer Defendants to arrest Plaintiff when he did return to the property.

224.  The conduct of Defendant Holtzman is gross, wanton or deliberate and demonstrates a high degree of moral culpability.

225.  As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages alleged herein.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff respectfully requests that this Court enter a Judgment:

A.    Declaring that Mt. Jackson and the Police Officer Defendants' conduct complained of herein violates Plaintiff's rights under the United States Constitution;

B.    Declaring that Defendant Holtzman's conduct complained of herein violates Plaintiff's rights under state law;

C.    Directing Defendants to pay Plaintiff compensatory damages in an amount to be determined by a jury;

D.    Directing Defendants to pay Plaintiff punitive damages in an amount to be determined by a jury;

E.    Awarding Plaintiff reasonable attorney's fees, costs and disbursements of this action;

F.    Granting such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated:  Brooklyn, New York

December 21, 2021

By:   /s/ Brian L. Bromberg
      Brian L. Bromberg
      One of Plaintiff's Attorneys

**Attorneys for Plaintiff**

David W. Silek (Virginia Bar No. 47409)
Sandground, West, Silek & Raminpour, PLC
8229 Boone Boulevard, Suite 610
Vienna, Virginia 22182
Telephone: (703) 361-9700
Fax: (571) 327-3311

Thomas R. Breeden (Virginia Bar No. 33410)
Thomas R. Breeden, P.C.
10326 Lomond Drive
Manassas, Virginia 20109
Telephone: (703) 361-9277
Fax: (703) 337-0441

Brian L. Bromberg (admitted *pro hac vice*)
Bromberg Law Office, P.C.
352 Rutland Road #1
Brooklyn, New York 11225
Telephone: (212) 248-7906
Fax: (212) 248-7908