IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

LUKE WILSON,             )
                              )
          Plaintiff,       )    Civil Action No. 5:21-cv-00055
                              )
v.                      )    **MEMORANDUM OPINION**
                              )
THE TOWN OF MOUNT JACKSON,  )    By:    Hon. Thomas T. Cullen
*et al.*,                       )             United States District Judge
                              )
          Defendants.   )

---

In the early morning hours of August 17, 2020, Defendant Officer Christina Whorton arrested Plaintiff Luke Wilson at 6091 Main Street in Mount Jackson, Virginia. Whorton had been conducting a property check at the direction of her supervisors, Defendants Sergeant Keith Cowart and Chief of Police Jeff Sterner, and they had told her specifically to look out for Wilson. Whorton's supervisors also told her that, if she found him, she was to call the property's purported owner, Defendant Todd Holtzman, for further direction.

Wilson protested his arrest. He explained that the home had been his, that it had been foreclosed on a few days before, and that he had Holtzman's permission to retrieve his belongings. Whorton, as instructed, called Holtzman. He told Whorton that Wilson was trespassing and that she should arrest him. After calling and checking with Cowart, Whorton did as Holtzman instructed. Wilson spent two days in jail, and, by the time he was released on bond, many of his personal effects had gone missing or been destroyed.

On August 17, 2021, Wilson sued Whorton, Cowart, Sterner, and Officers Robert Young and Mark Johnson (who were present when Whorton arrested Wilson) (collectively,

"Police Officer Defendants") for violating his Fourth Amendment right to be free of unreasonable seizures and his Fourteenth Amendment right to equal protection. His complaint also lists counts against Young and Johnson as bystanders to Whorton's arrest, and eight common-law tort claims against Holtzman. Finally, he alleges that the Town of Mount Jackson ("The Town") violated his constitutional rights.

The Police Officer Defendants filed a dispositive motion to dismiss all claims; the town did the same. Holtzman filed an answer.

For the reasons that follow, all of Defendants' motions will be granted in full. The court will decline to exercise supplemental jurisdiction over Wilson's remaining claims.

## I.   BACKGROUND

The facts are taken from Wilson's complaint and, at this stage, are presumed to be true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While factual assertions are entitled to this assumption of truth, legal conclusions couched as factual assertions receive no deference. *See id.*; *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (stating that, on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation.")

### a.  6091 Main Street

Wilson is a plumber and an Army veteran. (Am. Compl. ¶ 17 [ECF No. 68].) Around August 2019, he purchased the property at 6091 Main Street in Mount Jackson, Virginia, for $200,000. (*Id.* ¶¶ 18, 19.) Soon after the purchase, Wilson's business suffered due to both his declining health and the onset of the COVID-19 pandemic. (*Id.* ¶¶ 20, 21.) He quickly fell behind on his payments. (*Id.* ¶ 22.)

Around July 2020, Holtzman called Wilson about buying 6091 Main Street. (*Id.* at ¶¶ 27, 28.) Wilson told Holtzman that the property was not for sale. (*Id.* ¶ 30.) On July 14, 2020, Wilson received a letter from the property's mortgagee. (*Id.* ¶ 34.) That letter explained that Wilson was in default and that the property would be subject to a foreclosure sale on August 14, 2020. (*Id.*) Wilson alleges that Holtzman advised the mortgagee to initiate foreclosure proceedings. (*Id.* ¶ 35.) The foreclosure sale occurred as scheduled, and Holtzman bought the property. (*Id.* ¶¶ 38, 39.)

After the sale, Holtzman allegedly coordinated with Sterner to arrest Wilson. On Sterner's advice, Holtzman changed the locks on the house, nailed the doors shut, and hung "No Trespassing" signs. (*Id.* ¶ 49; *see id.* ¶ 48.) Sterner explained to Holtzman that the signs would empower police officers to arrest Wilson if Wilson returned to the property. (*Id.* ¶ 51.) Wilson also alleges that Holtzman directed Sterner to monitor the property for Wilson's return. (*See id.* ¶ 54.)

Holtzman and Sterner also attempted to locate Wilson, even going so far as to drive around town together looking for him. (*Id.* ¶¶ 79–81.) When they could not find Wilson, Holtzman contacted Wilson's mother, and told her to tell Wilson that Wilson needed to retrieve his possessions from 6091 Main Street before the coming Monday. (*Id.* ¶¶ 78, 80.) She apparently relayed that message to Wilson. (*Id.* ¶ 84.)

Putting everything together, Wilson alleges that Holtzman was trying to "lure" him to a property that the local police were monitoring. (*Id.* ¶ 83.) At no time did Sterner or Cowart ever investigate whether title had transferred to Holtzman upon his purchase at the foreclosure sale, or whether Holtzman retained some possessory interest in the property. (*See id.* ¶ 66.)

### b.  August 17, 2020 Arrest

Sterner and Cowart directed Whorton to monitor 6091 Main Street for any sign of Wilson. (*Id.* ¶¶ 61–63.) They further directed that, if she discovered Wilson, she was to call Holtzman, the purported property owner, and "act in accordance with Holtzman's instructions as to how to deal with Wilson." (*Id.* ¶ 63.) Whorton drove by the house at least eight times that weekend while she was on patrol duty. (*Id.* ¶ 64.) In the early morning hours of Monday, August 27, 2020, Whorton noticed lights on at the house; Wilson had returned to the property, with two friends, to collect his things. (*Id.* ¶¶ 84–87.)

Whorton approached Wilson and explained that he was not allowed on the property and needed to leave. (*Id.* ¶ 87.) Wilson responded that his mother had talked to Holtzman, who had said that Wilson needed to pick up his things before Monday. (*Id.* ¶ 92.) Whorton admitted that she did not know the specifics of the situation and that she needed to talk to Holtzman. (*Id.* ¶ 93.)

When she reached Holtzman, he accused Wilson of having kicked down the doors and "broke[n] in" to the house. (*Id.* ¶ 95.) Holtzman told Whorton that Wilson was trespassing and that she "had no choice" but to arrest him. (*Id.* ¶¶ 95, 97.) Whorton countered, suggesting that she could remove Wilson from the property and arrest him later as an alternative to arresting him immediately. (*Id.* ¶ 99.) Holtzman instructed Whorton to arrest Wilson. (*Id.* ¶ 100.)

Whorton called Cowart and explained that she "didn't know" the right thing to do, in part because she didn't know whether Wilson had been "evicted or given a trespass notice or anything." (*See id.* ¶¶ 103–04.) She explicitly expressed doubt about whether she had probable

cause to make an arrest, and she complained that she would prefer to just remove Wilson from the property and get an arrest warrant later. (*Id.* ¶¶ 105, 107.) But Cowart encouraged her to arrest Wilson. (*Id.* ¶ 106.) At this point, Whorton exclaimed, "to heck with it, if I do the wrong thing, I do the wrong thing," noting further, "if something comes up, they can always drop charges later." (*Id.* at ¶ 109.)

In the interim, officers Young and Johnson arrived at 6091 Main Street.[1] (*See id.* ¶ 110.) Whorton told them she was going to arrest Wilson, but not the two people with him. (*Id.*) Either Young or Johnson asked Whorton, "If you're foreclosed on today, does that automatically vacate your rights to the property?" (*Id.* ¶ 111.) Whorton said that she did not know. (*Id.*)

Whorton then arrested Wilson. (*Id.* ¶ 112.) She took him before a magistrate, who charged Wilson with trespass and burglary. (*Id.* ¶ 113.) During that proceeding, Whorton told the magistrate that Holtzman owned the property. (*Id.* ¶ 114.) Neither Young nor Johnson expressed doubt about Whorton's actions to any superior officers. (*Id.* ¶ 117.) And none of Whorton, Young, or Johnson ever investigated whether Wilson still had a possessory interest in the home. (*See id.* ¶ 66.)

Wilson spent about a day and a half in jail before posting bond. (*Id.* ¶ 119.) The Commonwealth's Attorney later dismissed the charges against Wilson. (*Id.* ¶ 122)

### c. Aftermath

After leaving jail, Wilson returned to 6091 Main Street to gather his personal possessions. (*Id.* ¶ 126.) Most of his personal property, however, had been removed or thrown

---

[1] The amended complaint does not say why Young and Johnson arrived.

away by Holtzman while Wilson was in jail. (*Id.* ¶ 128.) Specifically, Wilson alleges that Holtzman stole or destroyed a $5,000 rug, black-walnut lumber worth more than $20,000, furniture from the 1800s, and a bookcase Wilson had made for his daughter. (*Id.* ¶¶ 130, 131.) Wilson also alleges that Holtzman took and kept some of these items for personal use. (*Id.* ¶ 129.)

Wilson brings claims against all five police officers, the Town of Mount Jackson, and Holtzman. He alleges that each police officer violated his Fourth and Fourteenth Amendment rights and conspired together to do so. (*Id.* ¶¶ 144–63.) Wilson raises an additional charge, specific to Johnson and Young, for failure to intervene when Whorton arrested him. (*Id.* ¶¶ 164–68.) He also alleges that the municipality, Mount Jackson, violated his constitutional rights. (*Id.* ¶¶ 169–78.) A stray reference to Virginia's Constitution is attached to each of these claims. (*Id.* ¶¶ 146, 155, 162, 167, 177.) The claims against Holtzman are common-law tort claims. (*See id.* ¶¶ 179–225.)

## II.  STANDARD OF REVIEW

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While a complaint does not need "detailed factual allegations," complaints merely offering "labels and conclusions," "naked assertion[s] devoid of 'further factual enhancement,'" or "a

formulaic recitation of the elements of a cause of action will not do." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555, 557). Courts ruling on 12(b)(6) motions can consider documents attached to the complaint as exhibits. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (citing Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.")). "A motion for judgment on the pleadings under Rule 12(c) is assessed under the same standards as a motion to dismiss under Rule 12(b)(6)." *Occupy Columbia v. Haley*, 738 F.3d 107, 115 (4th Cir. 2013).

### III.   ANALYSIS

#### A.  Official Capacity Claims

Wilson brings each of his civil-rights claims against each of the Police Officer Defendants in both the officers' official and personal capacities. (Am. Compl. ¶ 15.) He has also sued the town of Mount Jackson, which employed the officers during all relevant times. (*Id.* ¶¶ 13–15, 169–78.)

The Supreme Court has described official-capacity suits as "another way of pleading an action against an entity of which an officer is an agent." *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quoting *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166. Accordingly, the civil-rights claims against the Police Officer Defendants in their official capacities are redundant of Wilson's claims against The Town "and thus should be dismissed as duplicative." *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004); *see also*

*Armstrong v. City of Greensboro*, 190 F. Supp. 3d 450, 462–63 (M.D.N.C. 2016); *Conley v. Town of Elkton*, No. 5:04CV00030, 2005 WL 415897, at *7 (W.D. Va. Feb. 22, 2005).

Wilson's official-capacity claims against the Police Officer Defendants will be dismissed.

## B. Civil Rights Conspiracy

In his civil rights claims against the Police Officer Defendants, Wilson alleges that the Defendants "conspired to deprive him of [his] rights" in violation of 42 U.S.C. § 1985(3). (*See* Am. Compl. ¶¶ 146, 155, 162, 167, 177.) Congress has created a cause of action for persons who have been injured by conspiracies to deprive them of their civil rights. *See* 42 U.S.C. § 1985(3). To state a claim under that statute, a plaintiff must plausibly allege:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (quoting *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995)).

Wilson's complaint fails because it never alleges that "a specific class-based, invidiously discriminatory animus" motivated the Police Officer Defendants. Alleging a civil-rights conspiracy requires "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). The Supreme Court has been clear that § 1985(3) does not "reach conspiracies motivated by economic or commercial animus." *United Brotherhood of Carpenters v. Scott*, 463 U.S. 825, 838 (1983); *see also id.* at 836–37 ("In the first place, it is a close question whether § 1985(3) was

intended to reach any class-based animus other than animus against Negroes and those who championed their cause."). And the Supreme Court has held open even whether sex is a protected class for purposes of § 1985(3). *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268–69 (1993). Taken together, the Supreme Court has declined on at least three occasions to recognize protected classes other than race for purposes of § 1985(3).

But the Fourth Circuit has extended § 1985(3)'s protections slightly further than the Supreme Court has. "To meet the requirement of a class-based discriminatory animus, under this section the class must possess the discrete, insular and immutable characteristics comparable to those characterizing classes such as race, national origin and sex." *Buschi v. Kirven*, 775 F.2d 1240, 1257 (4th Cir. 1985) (quotation omitted); *see also C & H Co. v. Richardson*, 78 F. App'x 894, 902 (4th Cir. 2003) (per curiam) (requiring an allegation either that "racial animus motivated the apparent unequal treatment," or that "some qualifying otherwise class-based discrimination" did so).[2] Even under this standard, Wilson fails to allege a plausible class-based, invidiously discriminatory animus. He comes closest when he alleges that "[t]he Police Officer Defendants intentionally singled out and targeted" him because of "the direction from Defendant Holtzman." (Am. Compl. ¶¶ 150, 153.) But this statement does not provide the "specific class-based, invidiously discriminatory animus" required for a civil rights conspiracy under 42 U.S.C. § 1985(3) because it makes no mention of any "discrete, insular [or] immutable characteristics comparable to those characterizing classes such as race, national origin, and sex." *See Buschi*, 775 F.2d at 1257. Instead, Wilson "assert[s] [a] cause[] of action

---

[2] Note, however, that the Fourth Circuit decided *Buschi* before the Supreme Court decided *Bray*, in which it declined to answer whether sex was a protected class under § 1985(3). The Fourth Circuit has not cited this language in *Buschi* in a published opinion since *Bray*.

under § 1985(3) by simply defining the aggrieved class as [someone] seeking to engage in the activity the defendant has interfered with." *See Bray*, 506 U.S. at 269. That's not enough.

Wilson's is not the first complaint to stumble at this step. District courts across the circuit frequently dismiss claims under § 1985(3) for failing to allege specific class-based, invidiously discriminatory animus. *See, e.g.*, *Facey v. Dae Sung Corp.*, 992 F. Supp. 2d 536, 541–42 (D. Md. 2014) (finding allegations that some defendants retaliated against plaintiff due to plaintiff's complaints about their workplace conduct insufficient to sustain a claim under § 1985(3)); *Sirleaf v. Clarke*, No. 3:18CV311, 2020 WL 1269787, at *13 (E.D. Va. Mar. 16, 2020) (finding allegations that defendants were discriminating against a prisoner because the prisoner had previously filed lawsuits against them insufficient to sustain a claim under § 1985(3)); *Roden v. Diah*, No. 7:07CV00252, 2008 WL 5334309, at *9 (W.D. Va. Dec. 19, 2008) (holding that "*pro se* litigants are not a class whose members may pursue a remedy under § 1985[(3)]" and collecting cases).

For these reasons, Wilson has failed to state a claim upon which relief can be granted under 42 U.S.C. § 1985(3). His civil-rights conspiracy claims against the Police Officer Defendants will be dismissed.

## C.  Fourth Amendment

### 1. Legal Standards

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Generally speaking, "[a] warrantless arrest is reasonable if the officer has probable cause to believe that the suspect committed a crime in the officer's presence." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586

(2018). The subjective motivations of the arresting officials are irrelevant if probable cause exists. *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011).

"Probable cause is determined by a 'totality-of-the-circumstances' approach." *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017) (citing *Illinois v. Gates*, 462 U.S. 213, 230 (1983)). Courts must consider "the whole picture." *Wesby*, 138 S. Ct. at 588. Evidence sufficient to secure a conviction is not required. *Hupp v. Cook*, 931 F.3d 307, 318 (4th Cir. 2019). Rather, probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Wesby*, 138 S. Ct. at 586 (citing *Gates*, 462 U.S. at 243–44 n.13). This is "not a high bar." *Id.*

To determine whether an arresting officer had probable cause for an arrest, district courts review the information available to the arresting officer and apply an objective test to determine whether a reasonably prudent officer with that information would have thought that probable cause existed for the arrest. *See Munday*, 848 F.3d at 253. "The inquiry turns on two factors: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct." *Hupp*, 931 F.3d at 318. The elements of criminal trespass and criminal burglary, as Virginia defines the crimes, then become important. A person is guilty of criminal trespass if the owner has forbidden him from entering the property, his entry is prohibited by signs that "may be reasonably seen," or he has been served with certain court orders. *See* Va. Code Ann. § 18.2-119; *Kim v. Commonwealth*, 797 S.E.2d 766, 772–73 (Va. 2017). Burglary is the breaking into and entering another's residence at night to commit a larceny or another felony inside. *See* Va. Code Ann. § 18.2-89; *Giles v. Commonwealth*, 672 S.E.2d 879, 882–83 (Va. 2009).

Wilson pleads counts of malicious prosecution and false arrest under § 1983 against each of the five Police Officer Defendants. Malicious prosecution and false arrest are related, but distinct claims. *See Brooks v. City of Winston-Salem*, 85 F.3d 178, 181–82 (4th Cir. 1996); *see also Smith*, 848 F.3d at 257. "A claim for false arrest alleges that a warrantless arrest lacked probable cause." *Smith*, 848 F.3d at 257. A claim for malicious prosecution alleges that a "defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Hupp*, 931 F.3d at 324.

But the two claims are complimentary. *See Smith*, 848 F.3d at 257. For example, when officers wrongly arrest a plaintiff without a warrant, a plaintiff can appropriately sue for false arrest. *Brooks*, 85 F.3d at 181. And if those same officers later have the plaintiff charged by a magistrate, a malicious prosecution claim allows plaintiff to recover damages accrued from that point forward. *Id.* at 181–82. In theory then, both claims are appropriate here because Whorton arrested Wilson without a warrant and had a magistrate set bond for Wilson. *See Wallace v. Kato*, 549 U.S. 384, 389 (2007) ("[A] false imprisonment ends once the victim becomes held *pursuant to such process*—when, for example, he is bound over by a magistrate . . . ."). Functionally, whether pleaded independently or in combination, each is "properly understood as a Fourth Amendment claim for unreasonable seizure . . . ." *Lambert v. Williams*, 223 F.3d 257, 261–62 (4th Cir. 2000).

All of this is to say that Wilson's Fourth Amendment claims depend on whether Wilson has plausibly alleged that Whorton seized him without probable cause. *Hupp*, 931 F.3d at 324–25. A finding that Whorton had probable cause at the time of Wilson's arrest would require

the court to dismiss his Fourth Amendment claims. *See id.* at 318–21 (false arrest); 323–25 (malicious prosecution).

The Police Officer Defendants have all raised qualified immunity as an affirmative defense against Wilson's Fourth Amendment claims. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The immunity protects officers not only from damages but also the costs of suit, like discovery. *Mitchell v. Forsyth*, 472 U.S. 511, 525–27 (1985).

Courts analyze qualified immunity using a two-part test. *See Wesby*, 138 S. Ct. at 589. First, the court must determine whether Wilson has plausibly alleged a violation of his constitutional rights. *Iqbal*, 556 U.S. at 678–79. Second, the court must determine whether that right was clearly established at the time of the alleged violation. *Wesby*, 138 S. Ct. at 589–91. Courts can address these prongs in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The plaintiff bears the burden on the first prong, and the officer bears the burden on the second. *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022). If either the plaintiff fails to carry his burden, or the officer carries his burden, the court must grant qualified immunity and dismiss the claim. *See id.* Even at the pleadings stage, dismissal is appropriate if "the face of the complaint clearly reveals the existence of a meritorious affirmative defense," such as qualified immunity. *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013).

The Supreme Court has "stressed the need to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Wesby*,

138 S. Ct. at 590 (cleaned up). "[A] body of relevant case law is usually necessary to clearly establish [a constitutional violation] with respect to probable cause." *Id.* (citing *Brosseau v. Haugen*, 543 U.S. 194, 199 (2018) (per curiam)). "If a person is arrested when no reasonable officer could believe . . . that probable cause exists to arrest that person, a violation of a clearly established Fourth Amendment right to be arrested only upon probable cause ensues." *Hupp*, 931 F.3d at 318 (alterations original) (quoting *Rogers v. Pendleton*, 249 F.3d 279, 290 (4th 2001)).

## 2.  Executive Summary

Wilson's Fourth Amendment claims boil down to one simple question: Does a police officer have probable cause to arrest someone for either burglary or trespass if that person is removing items from a home after midnight and tells the officer that they have the owner's permission to do so, but the owner denies having given this permission? The answer must be "Yes."

Once the court reaches that conclusion, no matter how it frames the specific constitutional rights at issue, it must dismiss Wilson's Fourth Amendment claims. There is no false arrest if the arresting officer has probable cause. *See Munday*, 848 F.3d at 257. And there is no malicious prosecution if the arresting officer had probable cause without reference to the actions of a third party. *Cf. Hupp*, 931 F.3d at 324–25 (analyzing whether a magistrate reviewing the operative criminal complaint could have found probable cause if that document did not contain the officer's false statements).

## 3.  False Arrest

Whether Wilson has stated a claim for false arrest depends on whether Whorton had probable cause to arrest him. *See Smith*, 848 F.3d at 257. Probable cause depends on what the

officer knows at the time of the arrest. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Does the observed conduct allow a reasonable officer to conclude that there is a substantial chance that the suspect is committing a crime? *See Hupp*, 931 F.3d at 318.

First, the court must consider what Whorton already knew and then observed upon her arrival to 6091 Main Street. Two of her superior officers had ordered her to conduct property checks at that address. (*See* Am. Compl. ¶¶ 61–63.) They specifically told her to look out for Wilson. (*Id.* ¶ 63.) And they instructed her to call Holtzman, the property's purported owner, if she found Wilson on the property. (*Id.*)

After midnight, Whorton saw lights on at the house and approached. (*See id.* ¶¶ 86–87.) She found Wilson and two of his friends. (*Id.* ¶ 85.) Whorton told Wilson he needed to leave the property, but Wilson explained that he was collecting personal items with Holtzman's permission. (*Id.* ¶¶ 88, 91–92.) Importantly, Wilson did not claim that he still owned the home; instead, he told Whorton that he was present with Holtzman's permission. (*See id.* ¶¶ 88, 92.) Whorton called Holtzman, the purported property owner, to determine how to proceed. (*Id.* ¶ 94.) When Holtzman picked up, she offered either to arrest Wilson or remove him from the property and get a summons for him later. (*Id.* ¶ 99.) Holtzman told her to arrest Wilson. (*Id.* ¶ 100.) In this moment, Whorton was not conflicted about whether she had probable cause to arrest Wilson. Rather, she was conflicted about whether to arrest him that night or arrest him later. (*See id.* ¶ 99.)

Whorton then called her supervisor, Cowart, who encouraged her to make the arrest. (*Id.* ¶¶ 102–06.) On their call, Whorton (1) complained that she did not know whether Wilson had been evicted or received a trespass notice and (2) expressed a preference for ordering

Wilson to leave and getting an arrest warrant against him later. (*Id.* ¶ 107.) Ultimately, she exclaimed "to heck with it, if I do the wrong thing, I do the wrong thing," and "if something comes up, they can always drop charges later." (*Id.* ¶ 109.)

Whorton told Johnson and Young that she had decided to arrest Wilson. (*Id.* ¶ 110.) One of them (the complaint does not say which) asked, "If you're foreclosed on today, does that automatically vacate your rights to the property?" (*Id.* ¶ 111.) Whorton responded that she was not sure. The three officers arrested Wilson but allowed his friends to leave. (*Id.* ¶¶ 110, 112.)

Whorton next brought Wilson before a magistrate. (*Id.* ¶ 113.) She said that Hotlzman owned the home where she discovered Wilson. (*Id.* ¶ 114.) The magistrate held Wilson on bond for burglary and trespassing. (*See id.* ¶ 119.)

Second, the court must consider the elements of those two crimes. Burglary requires (1) breaking and entering, (2) into the residence of another, (3) at night, (4) to commit larceny or another felony therein. *See Giles*, 672 S.E.2d at 882–83. After the foreclosure sale, Holtzman had changed the home's locks and nailed the doors shut. (Am. Compl. ¶ 49.) All three of the officers arrived at the home after midnight. (*See id.* ¶¶ 86, 110.) Wilson and his friends were inside the home, removing items. (*Id.* ¶¶ 85, 88.) And both Wilson and Holtzman had represented to Whorton that Holtzman owned the home. (*Id.* ¶¶ 63, 95.) On the well-pleaded facts of Wilson's amended complaint, there is a substantial chance that every element of burglary is satisfied. A reasonable officer could conclude that there was probable cause to believe Wilson was burglarizing 6091 Main Street. *Wesby*, 138 S. Ct. at 588.

The same goes for trespassing. Entry onto a property is a criminal trespass if either the property owner has warned the defendant not to enter or there is posted signage to that effect. Va. Code Ann. § 18.2-119. For example, "a 'No Trespassing' sign posted in a location where it may be reasonably seen prohibits any and all unauthorized entry onto the entirety of the premises." *Kim*, 797 S.E.2d at 773. Here, Wilson alleges that the signs were "prominent," so this requirement is met. (Am. Compl. ¶ 49.) But on top of that, Holtzman, the purported property owner, told Whorton that Wilson had broken into the home with "every intention" of breaking the law. (*Id.* ¶ 95.) For purposes of a probable cause analysis, a statement like this from the purported victim is presumed true. *See* 2 Wayne R. LaFave, *et al.*, *Crim Proc.* § 3.3(d) (4th ed. 2021).

Key aspects of Whorton's investigation line up with those of other police officers who, Virginia courts have concluded, had probable cause for a trespass arrest. Holtzman had hung "No Trespassing" signs. *See, e.g.*, *Joyce v. Commonwealth*, 696 S.E.2d 237, 244 (Va. Ct. App. 2010); *McClam v. Commonwealth*, No. 3349-02-2, 2004 WL 941240, at *2 (Va. Ct. App. May 4, 2004). He had also asked the police for help enforcing those signs. *See, e.g.*, *Joyce*, 696 S.E.2d at 244; *Goode v. Commonwealth*, No. 1643-98-3, 1999 WL 1134657, at *3 (Va. Ct. App. Sept. 28, 1999). "[Whorton] was patrolling the area in response to a specific request to enforce the no trespassing signs . . . ." *Goode*, 1999 WL 1134657, at *3 n.2. And although Wilson said that he had Holtzman's permission, Holtzman expressly disavowed any such grant of authority. *See Murphy v. Commonwealth*, No. 2845-08-2, 2010 WL 430830, at *4 (Va. Ct. App. Feb. 9, 2010) (probable cause existed where arrestees told the police officer that a security guard had given them permission to be on the property but the security guard did not object when the police

officer advised him that he was going to arrest the purported trespassers); *Bass v. Commonwealth*, No. 0304-08-2, 2009 WL 111635, at *3 (Va. Ct. App. Jan. 20, 2009) (arrestee's admission that he did not have permission to be on the property supported officer's finding of probable cause). *Contra Parham v. Commonwealth*, No. 1544-04-2, 2005 WL 2428304, at *1, 4–5 (Va. Ct. App. Oct. 4, 2005) (once an apartment owner tells an officer that an alleged trespasser has her permission to be present, the officer no longer has probable cause for trespass). In short, a reasonable officer could conclude that there was probable cause to believe Wilson was trespassing. *Wesby*, 138 S. Ct. at 588.

To underline the point, Whorton only needed probable cause for one of these crimes to avoid violating Wilson's constitutional rights. But the court finds that, given the well-pleaded allegations in Wilson's complaint, she had probable cause for both burglary and trespass.

Wilson's two arguments against this conclusion are unavailing. First, he emphasizes Whorton's ambivalent statements after speaking to Wilson, Holtzman, and Cowart: "to heck with it, if I do the wrong thing, I do the wrong thing," and "if something comes up, they can always drop charges later." (Am. Compl. ¶ 109.) But "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck*, 543 U.S. at 153. Thus, these statements, albeit flippant, do not vitiate Whorton's probable cause. (And, for the same reasons, the court cannot consider Whorton's statement that she was conflicted over arresting Wilson that night or later that week in deciding whether or not probable cause existed.)

Second, Wilson argues that under Virginia law he still had a legal interest in the home. Va. Code Ann. § 8:01-126(D)(4) provides that upon foreclosure, the prior owner of a single-family dwelling becomes a tenant at sufferance. *See* Va. Code Ann. § 8:01-126(D)(4).[3] To end that tenancy, the new owner must provide the former owner with three days' written notice. *Id.* On the statute's face, then, Wilson still had a possessory interest in 6091 Main Street.[4] His complaint assumes as much. (*See* Am. Compl. ¶¶ 41, 48.) He had a tenancy in the home, the argument goes, until and unless Holtzman gave him three days' notice to vacate, which Holtzman had not done.

The problem is that whether Wilson still had a possessory interest in the home does not matter. Generally, officers need not rule out an arrestee's claims of innocence. *See Sennett v. United States*, 667 F.3d 531, 536 (4th Cir. 2012). More specifically, officers effecting arrests for trespass need not credit innocent explanations offered by apparent trespassers. *See McClam*, 2004 WL 941240, at *2; *see also Wright v. City of Phila.*, 409 F.3d 595, 603 (3d Cir. 2005) ("The officers did not believe [plaintiff's] explanation for her entry. Although they may have made a mistake, their belief was not unreasonable in light of the information the officers possessed at the time."); *Walston v. City of N.Y.*, 289 F. Supp. 3d 398, 411 (E.D.N.Y. 2018) (officers were not required to investigate arrestees' protestations that they were leaseholders after confirming

---

[3] Virginia frequently amends the relevant statute. Virginia's legislature originally passed Va. Code Ann. § 8.01-126 on June 31, 2008, and the court has reviewed all nine past versions of the statute in addition to the operative version. The language about foreclosure creating a tenancy at sufferance does not appear until the version that became effective on July 1, 2018. The only court to cite this statute after the operative language became effective, but before Wilson's arrest in August 2020, makes no mention of this provision. *See Ononuju v. Va. Hous. Dev. Auth.*, No. CL18-7959, 103 Va. Cir. 57 (Sept. 3, 2019).

[4] Note, though, that the Police Officer Defendants vigorously contest this interpretation. They contend that whether Wilson "remain[ed] in possession" of the home was an open question because he was not current on his mortgage payments and the home was not his primary residence. (ECF No. 73 at 6–7 (Sterner); ECF No. 76 at 6–7 (Whorton); ECF No. 70 at 5–6 (Cowart).)

with the building owner that nobody was supposed to be living on the property). And officers can credit a purported trespasser's statement that he does not own the home he is found inside. *See Bass*, 2009 WL 111635, at \*3; *see also Galarnyk v. Fraser*, No. 08-3351, 2011 WL 3678433, (D. Minn. 2011) (finding probable cause for a trespass arrest because "[plaintiff] admits he was in a secured area without authorization"); *cf. Wesby*, 138 S. Ct. at 587–88 (officer appropriately discredited arrestees' assertions of permission to be on the property).

Wilson attempts to plead around this obstacle by alleging, in conclusory fashion, that Whorton should have known that Wilson was a tenant at sufferance of Holtzman's. Wilson alleges that Whorton, as a former deputy sheriff, had knowledge of the eviction process and should have known that Wilson retained a possessory interest in the property. (*See* Am. Compl. ¶¶ 71–74, 112.) But those loose assertions to not get Wilson where he needs to go. The fact that Whorton worked as a deputy sheriff at some unspecified time in the past is not enough to "allow[] the court to draw the reasonable inference that" Whorton knew the technicalities of a then 2-year-old provision (which no court had ever analyzed) tucked inside a then 10-month-old Virginia law. *See Iqbal*, 556 U.S. at 677. Unless Whorton had held that position within the last two years, she could have never applied the relevant provisions.

Three factual allegations that are entitled to a presumption of truth (and which require no inferences) undermine Wilson's assertion that Whorton knew he retained a tenancy in the home. First, in response to a direct question from either Johnson or Young about whether a foreclosure sale terminates the former owner's possessory interest in the home, Whorton responded that she did not know. (Am. Compl. ¶ 111.) Second, Whorton told the magistrate that Holtzman owned the home where she arrested Wilson. (*Id.* ¶ 114.) Third, while Whorton

was arresting Wilson, she told him that an injunction was in place preventing his return to the property. (*Id.* ¶ 72.) This was wrong as a matter as fact. Although the Circuit Court of Shenandoah County had granted an injunction against Wilson, the court conditioned that injunction on a $1,000 bond. (*Id.* ¶ 46.) No one paid this bond, and so the injunction remained ineffective. (*Id.* ¶ 47.) In any event, Whorton's knowledge of the foreclosure process, however she had acquired it, led her to conclude that Wilson was likely enjoined from being at 6091 Main Street.

At bottom, probable cause requires only "a substantial chance of criminal activity." *Wesby*, 138 S. Ct. at 586. Whether Wilson in fact had a legal right to remain on the property is irrelevant. Whether an arrestee has actually broken the law is an altogether different question— and one categorically harder to answer affirmatively—than whether a reasonable officer could think that there is a substantial chance the arrestee was engaged in criminal activity. In other words, "probable cause . . . requires less than that evidence necessary to convict." *Smith*, 848 F.3d at 253; *see also Durham v. Horner*, 690 F.3d 157, 185–87 (4th Cir. 2012) (affirming grant of summary judgment on a malicious prosecution claim because probable cause existed for an officer to arrest a misidentified, innocent plaintiff who ended up spending three months in jail).

In sum, the court finds that Whorton had probable cause to arrest Wilson. The court must dismiss Wilson's false arrest claim against each of the Police Officer Defendants because Whorton has probable cause for Wilson's arrest. *See Smith*, 848 F.3d at 257.

### 4. Malicious Prosecution

Probable cause, however, can be tainted. Malicious prosecutions claims allow arrestees to collect damages from officials who set in motion chains of events that lead to their seizures pursuant to fraudulent legal process. For example, an arresting officer might arrest someone on orders from a superior officer, bring the arrestee before a magistrate, and have the arrestee held subject to bond. If the superior officer did not have probable cause to order that arrest, and the responding officer did not have independent probable cause to effect that arrest, a claim for malicious prosecution is appropriate.

This is the basis for Wilson's claims against Sterner and Cowart.[5] "To state such a claim, a plaintiff must allege that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012). General tort principles govern the causation element's application. *Id.* Once the officer begins to convince another to initiate legal process without probable cause, he is "responsible for the natural consequences of his actions." *Malley v. Briggs*, 475 U.S. 335, 344 n.7 (1986). But if another actor determines that genuine probable cause exists independent of those representations, that determination acts as an independent superseding cause shielding the bad actor from liability. *Evans*, 703 F.3d at 647.

---

[5] On these facts—where the arresting officer presents the arrestee to the magistrate judge for a bond determination and the arresting officer is not alleged to have learned any new relevant information between the arrest and the presentation to the magistrate—the court concludes that the analysis of false arrest and malicious prosecution is effectively identical, at least as to the existence of probable cause at the time of the arrest. Accordingly, Wilson's claims of malicious prosecution against Whorton, Young, and Johnson will be dismissed. None of those officers allegedly set in motion the events that led to Wilson's being held on bond, which is the crux of a malicious prosecution claim. *See Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012).

Consider warrants, indictments, and the fellow officer rule. Even when an officer intentionally lies to secure a warrant, the officer is not necessarily liable for malicious prosecution. *See Miller v. Prince George's County*, 475 F.3d 621, 627–31 (4th Cir. 2007); *Johnson v. District of Columbia*, 927 F.3d 539, 547–48 (D.C. Cir. 2019) (collecting cases). If the officer's presentation, minus his tainted representations, would have secured a warrant, then the plaintiff has no cause of action for malicious prosecution. *See Miller*, 475 F.3d at 627–31 (conducting this analysis and determining that probable cause did not exist absent the officer's reckless representations); *Johnson*, 927 F.3d at 547–48 (same, but reaching the opposite conclusion).

Something similar is true in the indictment context. If a police officer improperly pressures a prosecutor to issue an indictment, then the police officer may be held liable for malicious prosecution if the person was "wrongfully indicted." *See Evans*, 703 F.3d at 647–48 (collecting cases). Of course, an uninfluenced decisionmaker's later independent determination that probable cause existed breaks the causal chain and immunizes the earlier decisions of even malicious officers. *Id.* at 647–48. Grand jury indictments, for example, can serve this role. *See Durham v. Horner*, 690 F.3d 183, 188–90 (4th Cir. 2012) (finding that a defendant officer who wrongly arrested someone with the same name as the suspect was not liable for malicious prosecution because a grand jury, which that officer had not interacted with, returned three indictments confirming probable cause).

These forgiving rules have an obvious parallel in the criminal context: the fellow-officer rule. This rule empowers officers without probable cause to make arrests based on orders from other officers, who are presumed to have probable cause. *See United States v. Hensley*, 469

U.S. 221, 230–233 (1985) (explaining the rule in the context of a *Terry* stop); *see also Crim Proc.* § 3.5(a). An arrest violates the Fourth Amendment if the arresting officer arrested the defendant on the instruction or request of another officer who did not have probable cause. *See Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 564–69 (1971) (recognizing that a necessary condition of the Fourth Amendment violation was that the arresting officer lacked probable cause); *United States v. Massenburg*, 654 F.3d 480, 492–93 (4th Cir. 2011). There is no Fourth Amendment violation, however, if the arresting officer has an independent basis for probable cause. *See Whiteley*, 401 U.S. at 568; *United States v. Laughman*, 618 F.2d 1067, 1072 n.3 (4th Cir. 1980) (acknowledging that another officer's basis for probable cause does not affect the analysis if the arresting officer has probable cause). In all three of these contexts, a later-in-time, independent determination of probable cause breaks the causal chain set in motion by the original actor who lacked probable cause.

Wilson alleges that Sterner and Cowart helped Holtzman lure Wilson back to 6091 Main Street and manufactured probable cause for his arrest. Sterner advised Holtzman to change the home's locks, nail the doors shut, and post "prominent" "No Trespassing" signs. (Am. Compl. ¶ 49.) Sterner explicitly told Holtzman that the signs would enable police officers to arrest Wilson if Wilson returned to the property. (*Id.* ¶ 51.) Sterner and Cowart assigned Whorton to conduct property checks. (*Id.* ¶¶ 61–62.) If she discovered Wilson on the property, she was to call Holtzman for directions. (*Id.* ¶ 63.) And after Cowart received Whorton's call, he encouraged her to arrest Wilson as Holtzman requested. (*Id.* ¶ 106.)

But none of these allegations undermine the determinative fact that Whorton had independent probable cause to arrest Wilson for the reasons discussed above. An officer,

though ordered to the scene of an alleged crime, who observes probable cause with her own eyes, breaks the chain of causation required for a successful malicious prosecution claim. The court's finding that Whorton had probable cause is fatal to Wilson's malicious prosecution claim against Sterner and Cowart. *See Durham*, 690 F.3d at 188–90.

Wilson has not carried his burden to allege a Fourth Amendment violation against either Sterner or Cowart. Although Wilson's allegations that these law enforcement principals coordinated with and showed favoritism towards a prominent member of their local community, *if true*, describe conduct that is troubling, to say the least, the fact remains that Whorton had probable cause to arrest Wilson. Thus, their alleged scheme did not cause Wilson to be arrested unlawfully.

Wilson has failed to state a Fourth Amendment claim for which relief can be granted against any of the five Police Officer Defendants. Each Police Officer Defendant is therefore entitled to qualified immunity on the first prong. *See Pearson*, 555 U.S. at 236.

### D. Failure to Intervene

In his amended complaint, Wilson alleges that Young and Johnson violated his constitutional rights by failing to intervene to stop an unlawful arrest. (Am. Compl. ¶ 164–68.) Failure to intervene is constructively a claim for bystander liability. *Randall v. Prince George's County*, 302 F.3d 188, 204 (4th Cir. 2002). "The rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer." *Id.* at 204 n.24. Bystander liability requires that an officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Id.* at 204.

Young and Johnson argue that Wilson has not plausibly alleged that they knew Whorton was violating Wilson's constitutional rights. The operative question, then, is whether Young and Johnson knew Whorton was arresting Wilson without probable cause. *See id.* at 204–05. But, as explained above, Whorton had probable cause to arrest Wilson. Because Whorton had probable cause, there is no underlying constitutional violation upon which bystander liability can attach. "The very essence of bystander liability . . . is premised on an individual's passivity and nonparticipation while another individual violates a person's constitutional rights . . . ." *Stevenson v. City of Mount Pleasant*, 743 F.3d 411, 419 (4th Cir. 2014). As a result, there can be no bystander liability because Whorton did not violate Wilson's constitutional rights. *See Brooks v. Johnson*, 924 F.3d 104, 112 n.3 (4th Cir. 2019) (explaining that a district court "had no occasion to consider the second two prongs" given its conclusion that there had been no illegal act).

Therefore, Wilson has failed to state a claim of bystander liability against Johnson and Young. This claim must be dismissed.

### E. Equal Protection

The Fourteenth Amendment provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This Equal Protection Clause "secure[s] every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution . . . ." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (quoting *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445 (1923)). Here, Wilson

brings a class-of-one equal protection claim.[6] *See Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 601 (2008); *Olech*, 528 U.S. at 564–65. In a meritorious class-of-one claim, "the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564.

Wilson has brought equal protection claims against each of the Police Officer Defendants. Sterner, Cowart, and Whorton asserted qualified immunity in response.

Here, Wilson has failed to allege a class-of-one claim because he has identified no similarly situated comparators. His complaint includes only blanket allegations that he was treated worse than others similarly situated. (*See* Am. Compl. ¶ 75 ("The Police Officer Defendants would not have expended these resources or failed to conduct basic due diligence for any other similarly situated person."); *id.* ¶ 77 ("The Police Officer Defendants would not have responded in the same way to any other similarly situated person."); *id.* ¶ 135 ("Chief Sterner did not treat Wilson as he did other similarly situated residents of Mt. Jackson and thereby deprived Wilson of the equal protection of the laws."); *id.* ¶ 151 ("In doing so, Mt. Jackson and the Police Officer Defendants treated Wilson differently from other, similarly situated people – i.e., others whose houses had been subject to a foreclosure sale.").

This is not enough to satisfy the first element of a class-of-one claim. Such a claim has two elements: that the plaintiff "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *King v. Rubenstein*,

---

[6] "Pleadings must be construed so as to do justice." Fed. R. Civ. P. 8(e). "Courts should focus on the substance of the allegations to avoid making pleading a formalistic headache." *Stanton*, 25 F.4th at 238. Wilson's complaint never specifies whether his equal protection claim is a protected-class claim or a class-of-one claim. But the only plausible reading of his complaint is that it alleges a class-of-one claim.

825 F.3d 206, 220 (4th Cir. 2016) (quoting *Willis v. Town of Marshall*, 426 F.3d 251, 263 (4th Cir. 2005)).

Accordingly, the Fourth Circuit has repeatedly held that the failure to identify or necessarily imply a similarly situated comparator is fatal to a class-of-one claim. *See Siena Corp. v. Mayor & City Council of Rockville*, 873 F.3d 456, 465 (4th Cir. 2017) (reasoning that this failure was fatal at summary judgment); *Tri-County Paving, Inc. v. Ashe County*, 281 F.3d 430, 440 (4th Cir. 2002) (same); *cf. Sansotta v. Town of Nags Head*, 724 F.3d 533, 542 (4th Cir. 2013) (assuming that plaintiff's allegations satisfied the similarly situated element).[7] Of course, where the plaintiff has identified or necessarily implied a similarly situated comparator, their class-of-one claims have proceeded. *See King*, 825 F.3d at 220–21; *Willis*, 426 F.3d at 263–64. But Wilson's complaint has not done this, and that failure requires the court to dismiss Wilson's equal protection claims.

But regardless of whether Wilson's complaint satisfies the similarly situated prong, Wilson's claims stumbles on a second obstacle—qualified immunity. The court must dismiss his equal protection claims because it is not clearly established in this circuit that a police officer's investigative decisions are cognizable under a class-of-one theory.

---

[7] Other circuits have been more explicit that plaintiffs must identify potential comparators in their pleadings. *See, e.g.*, *Rountree v. Dyson*, 892 F.3d 681, 685 (5th Cir. 2018) ("Rountree's equal-protection claim fails because he did not sufficiently allege that he has been treated differently from others similarly situated. His complaint generally alleges that other similarly situated individuals were treated differently, but he points to no specific person or persons and provides no specifics as to their violations."); *Najas Realty, LLC v. Seekonk Water Dist.*, 821 F.3d 134, 144 (1st Cir. 2016) (affirming grant of motion for judgment on the pleadings where plaintiff nominally identified ten purported comparators but "in no way explained how the projects were similarly situated"); *Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.*, 813 F.3d 1124, 1129 (8th Cir. 2016) (affirming grant of motion to dismiss class-of-one claim because "nothing in Higgins's pleadings alleges another contractor, whose employees were members of a different union, was identical or directly comparable to Higgins in all material aspects") (cleaned up).

Some background is useful here. "[T]he Equal Protection Clause protects persons, not groups." *Engquist*, 553 U.S. at 597 (quotation omitted). Historically, class-of-one claims have involved a government actor deviating from a non-discretionary standard without a rational basis. For instance, a county cannot assess taxes on one piece of property in its jurisdiction based on its full value when it only taxes other similarly situated property in its jurisdiction at 55 percent of that full value. *See Sioux City Bridge Co.*, 260 U.S. at 445–47. Similarly, a municipal government's demand for a 33-foot easement from one property owner when a 15-foot easement would be enough and the government had only requested 15-foot easements from all similarly situated property owners also violates equal protection. *See Olech*, 528 U.S. at 564–65.

In 2008, the Supreme Court laid down a marker on the other end of a spectrum. Public employment decisions are non-cognizable for class-of-one claims because they "involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." *Engquist*, 553 U.S. at 603. "This principle applies most clearly in the employment context, for employment decisions are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify." *Id.* at 604.

The Fourth Circuit has never extended *Engquist*'s reasoning beyond the public employment context. *See Sansotta*, 724 F.3d at 542 n.13; *see also Pulte Home Corp. v. Montgomery County*, 909 F.3d 685, 692, 695 (4th Cir. 2018) (reasoning that zoning decisions are "inherently discretionary" and "a quintessential example of subjective and individualized action" before resolving the claim on its merits); *King*, 825 F.3d at 220–22 (reversing the dismissal of a class-of-one equal protection claim in the prison-discipline context without considering whether the

defendants' conduct was discretionary). There is no standard for this court to attempt to apply to Wilson's claim.

Although other circuits have extended *Enquist* in various ways, none of those rules are binding on this court. The Eighth Circuit, for example, has explicitly held that "a police officer's investigative decisions . . . may not be attacked in a class-of-one equal protection claim." *Flowers v. City of Minneapolis*, 558 F.3d 794, 799–800 (8th Cir. 2009). The Seventh Circuit has held that a prosecutor's charging decisions are similarly immune from suit. *United States v. Moore*, 543 F.3d 891, 899–901 (7th Cir. 2008).

Still, some circuits have declined to extend *Engquist* to new contexts. The Seventh Circuit has held that, where the plaintiff has alleged a similarly situated comparator, the actions of an "officer motivated by malice alone" can provide the basis for a class-of-one claim. *Hanes v. Zurick*, 578 F.3d 491, 496 (7th Cir. 2009). And the Sixth Circuit has so far declined to extend *Engquist* beyond public employment decisions. *See Johnson v. Morales*, 946 F.3d 911, 939 n.5 (6th Cir. 2020) (White, J., majority opinion) (collecting cases).

In any event, this court need not pick between the different alternatives on offer. It is enough that the Fourth Circuit has not chosen between them. There is an open question as to whether law enforcement activities are cognizable as class-of-one claims in this circuit. And so there is no question that even if Wilson has pleaded a constitutional violation, it is not a violation of clearly established law. As a result, Sterner, Cowart, and Whorton are entitled to qualified immunity.

The court must dismiss Wilson's equal protection claims for two independent reasons. First, Wilson's complaint fails to allege the identity of any similarly situated comparator. As

such, Wilson has failed to state a class-of-one claim under the Fourteenth Amendment's Equal Protection Clause. This reason applies to every Police Officer Defendant. Second, the Fourth Circuit has never addressed which discretionary government activities, let alone law enforcement's investigative decisions, can provide the basis for a class-of-one claim. So, even if Wilson has alleged a class-of-one claim, Sterner, Cowart, and Whorton are entitled to qualified immunity because it is not clearly established that a police officer's individualized investigative decisions can violate the Equal Protection Clause under a class-of-one theory.

Wilson's equal protection claims against the Police Officer Defendants will be dismissed.

### F. *Monell* Liability

Wilson's remaining claim against Mount Jackson depends upon a constitutional violation by one of the Police Officer Defendants. Local governments are liable for civil rights violations caused by the execution of a government's policy or custom. *Monell*, 436 U.S. at 690–91. "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).

Here, where no public official has violated Wilson's constitutional rights, there is no basis for *Monell* liability. "If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) (emphasis in original).

As explained above, the Police Officer Defendants did not violate Wilson's rights under either the Fourteenth Amendment or the Fourth Amendment. Therefore, the court must dismiss Wilson's *Monell* claim. *See Evans*, 703 F.3d at 654–55 (4th Cir. 2012).

### G. Supplemental Jurisdiction

Wilson brings eight state-law claims against Holtzman. Further, appended to each of his claims against the Police Officer Defendants is a reference to the Virginia Constitution.

The court's jurisdiction over these claims is tied to its jurisdiction over Wilson's federal claims. *See* 28 U.S.C. § 1367(a). As the court has "dismissed all claims over which it has original jurisdiction," it "may decline to exercise supplemental jurisdiction" over Wilson's remaining claims. *See id.* § 1367(c); *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995).

"[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendant jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). These factors overlap considerably, and they all point toward declining jurisdiction here.

"At this early stage in the litigation, where minimal federal resources have been expended, and [complete diversity does not exist], judicial economy is served by [dismissing] the case." *See Burch v. N.C. Dep't of Pub. Safety*, 158 F. Supp. 3d 449, 466 (E.D.N.C. 2016). Dismissal also serves comity because the only remaining claims are state-law claims. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims

should be dismissed as well."). "As to fairness, because the proceedings are at such an early stage, no party—all of whom appear to reside in the [Mount Jackson] area—would be prejudiced by [dismissal]." *Hassan v. Miamee*, No. 1:20-cv-00488, 2020 WL 9347966, at *2 (E.D. Va. June 1, 2020). And convenience is served because all of Wilson's claims that were inside the statute of limitations when he filed this action remain within the statute of limitations. *See* Va. Code Ann. § 8.01-243 (setting a two-year statute of limitations on "every action for personal injuries"); *Burch*, 158 F. Supp. 3d at 466.

The court will decline jurisdiction over Wilson's state-law claims against Holtzman.[8]

## IV.   CONCLUSION

For the reasons discussed above, Whorton's motion to dismiss Wilson's Fourth Amendment, Equal Protection, and civil rights conspiracy claims against her in both her official and personal capacities (ECF No. 23) will be granted. Johnson and Young's motion to dismiss Wilson's Fourth Amendment, Equal Protection, bystander liability, and civil rights conspiracy claims against them in both their official and personal capacities (ECF No. 5) will be granted. Cowart's motion for judgment on the pleadings as to Wilson's Fourth Amendment, Equal Protection, and civil rights conspiracy claims against him in both his official and personal capacities (ECF No. 33) will be granted. Sterner's motion to dismiss Wilson's Fourth Amendment, Equal Protection, and civil rights conspiracy claims against him in both his official and personal capacities (ECF No. 9) will be granted. Mount Jackson's

---

[8] Although the Mount Jackson Police Department filed a motion to dismiss the complaint as to any charges against it, the parties have since clarified that the Police Department was not and has never been a party to this action. As a result, the Police Department's motion to dismiss will be denied as moot. (*See* ECF No. 49.)

motion to dismiss Wilson's *Monell* claim (ECF No. 49) will be granted. The court will decline jurisdiction over all remaining claims.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to the parties and all counsel of record.

**ENTERED** this 17th day of March, 2022.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE